Edward BALLOW, D.P.M.; Foot Associates, P.C.; Mark P. Berland, D.O.; Richard N. Bernhardt, M.D., Richard N. Bernhardt, M.D., P.C.; Leonard D. Bernstein, M.D., the OB/GYN Associates, P.C.; J. Tashof Bernton, M.D.; J. Tashof Bernton, M.D., P.C.; Roland J. Brandt, D.O.; High Country Orthopedic Associates of Colorado Springs, P.C.; Robert A. Brumfield, M.D.; Rustic Hills Orthopaedic Association, P.C.; W.M. Campbell, M.D.; Southern Colorado OB/GYN, P.C.; Joseph Carpenter, M.D.; Joseph Carpenter, M.D., P.C.; John Chisholm, M.D.; Denver Obstetrical and Gynecological Associates, P.C.; Harvey M. Cohen, M.D.; Cohen and Conner Professional Corporation; Wayne Conner, M.D.; Gayle P. Crawford, M.D.; Drs. Ross and Crawford, P.C.; David L. Crosson, M.D.; Pueblo Orthopedic Professional Corporation; Jacqueline M. Demolin, M.D.; Goodman OB/GYN Associates, P.C.; Larry M. Dewell, M.D.; Beverly E. (Jessup) Donnelly, M.D.; Fort Collins Women's Clinic, P.C.; Terry A. Downing, M.D.; Terry A. Downing, M.D., P.C.; John H. Drabing, D.O.; Thomas F. Driver, M.D.; Paul S. Drohan, M.D.; Paul S. Drohan, M.D., P.C.; Edward Duerksen, M.D.; Edward Duerksen, M.D., P.C.; Samuel C. Duhon, Jr., M.D.; Samuel C. Duhon, Jr., M.D., P.C.; Edward L. Ehrichs, M.D.; Reich & Ehrichs, P.C.; Frederick C. Feiler, M.D.; Glen C. Ferguson, D.O.; Glen C. Ferguson, D.O., P.C.; Glenn T. Foust, III, M.D.; Denver–Evergreen OB/GYN Group, P.C.; Donald P. Gazibara, M.D.; W.B. Goddard, M.D.; Woodridge Women's Clinic, P.C.; Reid A. Goodman, M.D.; Stanley N. Goodman, M.D.; Ronald A. Green, D.P.M.; Michael L. Hall, M.D.; Linder and Hall OB/GYN Associates, P.C.; Gordon C. Ham, M.D.; Gordon C. Ham, M.D., P.C.; Richard G. Hamill, M.D.; David Harris, M.D.; David Harris, M.D., P.C.; Lowell N. Harris, M.D.; James F. Hartman, M.D.; James F. Hartman, M.D., P.C.; Duval E. Harvey, M.D.; Robert W. Hendee, Jr., M.D.; Pediatric Neurosurgery, P.C.; Raymond W. Henry, M.D.; David F. Holz, D.P.M.; Allied Foot and Ankle Clinics of Colorado, P.C.; Brett S. Hulet, M.D.; Herbert L. Jacobs, M.D.; Valerie A. Jacobs, M.D.; David Kessel, M.D., P.C.; Arvada Pediatric Associates, P.C.; Ransy L. Jeffrey, M.D.; Johnny E. Johnson, Jr., M.D.; Johnny E. Johnson, Jr., M.D., P.C.; Elisabeth Kandel, M.D.; Family Medicine Associates; Ralph L. Kelley, M.D.; Corwin Orthopedic Group, P.C.; Kelvin F. Kesler, M.D.; David Kessel, M.D.; Thomas E. Kilfoyle, M.D.; Edward Kirschman, M.D.; Michelson, Losasso, Kirschman, M.D., P.C.; Joshua J. Kopelman, M.D.; Eugene E. Lalli, D.O.; Eugene E. Lalli, D.O. & Associates, P.C.; David Leistikow, M.D.; Edward Lord, M.D.; Leonard J. Losasso, M.D.; Stephen L. Ludwig, M.D.; Gary A. Ludwin, M.D.; Eva Martin, M.D.; Thomas Tuttle McCarthy, D.O.; Edward Larry McCleary, M.D.; James W. Meeuwsen, M.D.; M.H. Melmed, M.D.; M.H. Melmed, M.D., P.C.; T. Robert Mestas, M.D.; Gary A. Meyer, D.O.; Abraham K. Michelson, M.D.; David J. Muller, M.D.; Martin E. Nowick, M.D.; Martin E. Nowick, M.D., P.C.; E.P. O'Loughlin, M.D.; Robert P. Paunovich, D.O.; Mark W. Pfenninger, M.D.; Mark W. Pfenninger, M.D., P.C.; Peter Press, M.D.; Anesthesia Associates, P.C.; Alan M. Rapaport, M.D.; Marshall P. Reich, M.D.; Bruce C. Richards, M.D.; Ira Rifkin, M.D.; Ira Rifkin, M.D., P.C.; Michael H. Ross, M.D.; Nancy A. Rudd–McCoy, M.D.; Keith Sadler, M.D.; Keith Sadler, M.D., P.C.; Ron Schneebaum, M.D.; Joseph M. Sherman, M.D.; Lloyd V. Shields, M.D.; Joseph Shroyer, M.D.; Murray M. Snyder, D.O.; Contemporary OB/GYN, P.C.; Stanley H. Solomon, D.P.M.; Lawrence Spivack, M.D.; Colorado Eye Specialists, P.C.; Stephen L. Stoll, M.D.; Phillip Tannenbaum, M.D.; Phillip Tannenbaum, M.D., P.C.; Richard C. Taylor, M.D.; Arapahoe Bone and Joint Surgeons, P.C.; Dwayne Thomason, D.O.; Yona Victor, M.D.; Joan Weiss, M.D.; Robert Weiss, D.O.; Robert Weiss, D.O., P.C.; Max L. Weissman, M.D.; Russell J. Weister, M.D.; Harry

Wherry, M.D.; Patrick Wherry, M.D.; Kevin Whitaker, M.D.; Derek Williams, M.D.; Murray S. Willis, M.D.; Murray S. Willis, M.D., P.C.; Mark R. Wolf, M.D.; S. Steve Yasazawa, M.D.; S. Steve Yasuzawa, M.D., P.C.; and John R. Young, M.D., Petitioners,

v.

PHICO INSURANCE COMPANY, a Pennsylvania corporation, Respondent.

No. 92SC530.

Supreme Court of Colorado, En Banc.

Nov. 15, 1993.

Rehearing Denied Dec. 6, 1993.

McDermott, Hansen & Reilly, Gerald P. McDermott, William J. Hansen, Denver, for petitioners.

Wood, Ris & Hames, P.C., F. Michael Ludwig, Mary E. Kanan, Mary E. Gibbons, Denver, for respondent.

Hall & Evans, Alan Epstein, Denver, for amicus curiae the American Ins. Ass'n.

Catherine Sparkman, Denver, Richard E. Barnsback, Phillip E. Stano, David M. Leifer, Washington, DC, for amicus curiae Blue Cross and Blue Shield of Colorado and American Council Life Ins.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Merrill Shields, Deputy Atty. Gen., Richard Djokic, First Asst. Atty. Gen., Robert M. Howard, Senior Asst. Atty. Gen., Regulatory Law Section, Denver, for amicus curiae Colorado Com'r of Ins.

Justice MULLARKEY delivered the Opinion of the Court.

We granted certiorari in this case to address several issues arising out of a medical malpractice insurance carrier's withdrawal from the Colorado market. The trial court, in a 294–page order, ruled in favor of the petitioners who are the doctors formerly insured by the medical malpractice insurance carrier. It held that the insurance carrier breached its contract with the doctors, engaged in fraud and negligent misrepresentation, and acted in bad faith. The court of appeals, in *Ballow v. PHICO Insurance Co.,* 841 P.2d 344 (Colo.App.1992), reversed, holding that the trial court erred in finding that the insurer breached its contract with the doctors, and that it engaged in fraud, negligent misrepresentation, and bad faith conduct. We granted certiorari and, for the reasons set forth below, we reverse.

## I.

The petitioners are 105 medical doctors, doctors of osteopathy, and doctors of podiatric medicine practicing in the State of Colorado (collectively referred to in this opinion as doctors). The respondent, PHICO Insurance Co. (PHICO), is a medical malpractice insurance carrier owned by the Hospital Association of Pennsylvania (HAP).

PHICO was created in 1976 as a Pennsylvania malpractice insurer specializing in hospital coverage. In 1978, HAP decided to expand its programs and operations into states other than Pennsylvania, and to broaden its customer base to independent physicians.[1] PHICO began marketing a claims-

made policy in Colorado in the spring of 1981 and sold its first independent physician policy here on February 1, 1982.

To properly approach this case, a basic understanding of the concepts relevant to claims-made insurance coverage is required. There are presently two basic types of professional liability insurance policies: claims-made and occurrence. *See* Regulation 5–1–8, 3 C.C.R. 702–5 (1992). A pure claims-made policy provides coverage for claims made during the policy period, regardless of when the events out of which the claim arose occurred.[2] 7A J. Appleman, *Insurance Law and Practice* § 4503, at 96 (Supp.1992). In contrast, an occurrence policy provides coverage for all "occurrences" which take place during a policy period, regardless of when the claim is made. *Id.*

Insureds who purchase claims-made policies can protect themselves against claims made after the policy terminates in one of two ways. One option is to obtain "prior acts" coverage. Under this option, the new insurer charges an additional premium to cover the insured for acts occurring before the inception date of the new policy. Insurers need not offer this coverage. Another option is to purchase extended reporting period, or "tail," coverage. *See* Regulation 5–1–8, 3 C.C.R. 702–5 (1992). This coverage, which is usually available,[3] is purchased from the first insurer and covers future claims made for incidents occurring during the time of the claims-made coverage. In effect, such coverage turns claims-made coverage into occurrence coverage.[4]

---

1. The term "independent physicians," as used in this opinion, refers to those physicians with private practices who may have privileges at certain hospitals but who are not employed by such hospitals. "Employed physicians" are employed by hospitals.

2. There is also a "hybrid" claims-made policy, requiring both a medical incident and a claim within the coverage period. Some jurisdictions have declared this hybrid to violate public policy in certain circumstances. *See Sparks v. St. Paul Ins. Co.,* 100 N.J. 325, 495 A.2d 406 (1985). Although the PHICO policy contains provisions characteristic of a hybrid claims-made policy, we need not address these public policy concerns since PHICO does not press this particular construction of its coverage.

3. Pursuant to section 10–4–419, 4A C.R.S. (1987 & 1993 Supp.), claims-made policies issued or used in this state on or after January 1, 1987 must offer the insured the option to buy an extended reporting period policy of at least one year's duration with coverage equal to the aggregate limit of the policy coverage, for a premium not to exceed two hundred percent of the expiring policy premium. This statute was not in effect at the time of the events in question.

4. It is different from traditional occurrence coverage, however, in that there is only one policy (and one set of coverage limits) spanning all of the years that an insured had claims-made coverage with a given insurer.

When PHICO entered the Colorado market, most physicians were insured under occurrence policies and were reluctant to switch to claims-made policies. This reluctance stemmed, in part, from uncertainty concerning the cost of tail coverage. Many doctors testified that they feared the cost of tail coverage would be "unpredictably expensive," and that "the insurance company would be able to create any number out of the air and say this is [what it's] going to cost you to get out of the company." To allay the doctors' fears concerning the unpredictable cost of tail coverage, PHICO made numerous guarantees in its marketing. For example, Mr. Rodger Hasty, PHICO's Regional Manager in Denver, wrote to a prospective insured on October 12, 1982, repeatedly emphasizing that PHICO offered a percentage "cap" on both claims-made policy and tail policy premiums. PHICO sent prospective insureds a letter dated April 25, 1983, containing similar assurances:

> We have eliminated all of the "unknowns" in the purchase of a "tail" policy. Its cost is now as predictable as the occurrence rate. Each policy will contain an endorsement which guarantees the cost of the basic claims-made coverage, as a percentage of our occurrence rate, and the cost of a tail policy, as a percentage of our mature (4th year) claims-made rate in effect at the commencement of your current claims-made policy.

A further example can be found in a letter dated June 8, 1983, from a PHICO agent to a physicians' group. This letter promised that "[t]he tail charges are guaranteed in the policy and are in no way subject to underwriting whims."

An endorsement to PHICO's early policies provided that tail coverage would be available for 79 percent of the mature rate premium after one year of coverage with PHICO, 112 percent of the mature rate premium after two years of coverage, and 118 percent after the third and every subsequent year of coverage. Despite previous assurances that the percentage rates on tail policy premiums were "capped," PHICO raised these rates on October 1, 1984. The new percentages, listed as an endorsement to the policy, were 89 percent of the mature premium rate after one year, 134 percent after the second year, and 140 percent after the third and every subsequent year.

This new endorsement also provided that "[t]ail policy premiums are percentages of the fourth-year premium in effect at the inception of the last policy period under the claims-made policy." As part of its April 1, 1986 premium increase, however, PHICO changed the date from which the tail premium was determined from the premium in effect at the beginning of the last policy year, to the premium in effect at the inception of the tail policy.

Changes in the terms of PHICO's tail policy coincided with changes occurring in PHICO's business philosophy. PHICO experienced its first net loss in 1984, amounting to $20 million before discounting. As of November 1, 1984, PHICO ceased accepting new individual physician business altogether. In correspondence sent to policyholders in 1985, PHICO claimed that it took this action to ensure that PHICO would remain strong for its present insureds. In fact, PHICO had altered its business plan, and had shifted its emphasis from individual doctors to institutional insureds, i.e., hospitals, and had as one of its 1985 business plan goals the reduction of its individual physician policy count. This goal included a timetable: 190 fewer individual physician policies by March 31, 1985; 310 by June 30; 810 by September 30; and 1,069 by the end of the year. The next year's business plan also included a timetable for reducing the individual physician policy count: 50 fewer individual physician policies by January 31, 1986; 100 by the end of February; 175 through March; 250 through April; 325 through May; 400 through June; 575 through July; 650 through August; 725 through September; 800 through October; 875 through November; and 1000 by year's end.

As the trial court noted, while PHICO's financial position allegedly worsened, its representations of longevity and stability became "almost strident" in their frequency and intensity. The court of appeals likewise found that PHICO kept its aggressive campaign for new business intact, despite radical

changes in PHICO's business philosophy and indications that PHICO's continued presence in Colorado was questionable. *Ballow*, 841 P.2d at 349.

The actual decision to nonrenew independent physicians was made tentatively in a President's Committee meeting on June 12, 1986. The minutes of that meeting state that no announcement of the decision, even to staff, would be made until an official statement had been drafted and approved by the President's Committee. The decision was finalized in a follow-up President's Committee meeting on June 18, and presented to and approved by the Board of Directors on June 27 as part of the business plan.

PHICO sent a letter dated July 21, 1986 to the Colorado doctors, informing them about its decision to withdraw from the Colorado market. However, most of the doctors had renewal dates in July or earlier. Therefore, when they were informed about the withdrawal, the majority of the doctors had already renewed their policies requiring new, higher tail premium rates. If the doctors wanted to purchase tail coverage, they had no choice but to purchase a PHICO policy at these higher rates. COPIC, the only viable malpractice carrier in the market, did not offer "prior acts" coverage, and the Hartford Insurance Company had announced its decision to withdraw from the Colorado market on June 3, 1986.

In 1987, the doctors filed suit against PHICO, alleging breach of contract, fraud and negligent misrepresentation, bad faith, and interference with contract and prospective business opportunity. After a lengthy bench trial, the trial court entered judgment in favor of the doctors on the breach of contract, fraud and negligent misrepresentation, and bad faith claims. It also awarded punitive damages to 29 of the 105 doctors. PHICO appealed, and the court of appeals reversed, holding that PHICO did not breach its insurance contracts with the doctors when it changed the terms of its tail policy, and that the doctors' other claims failed mainly for that reason. We granted certiorari to review the court of appeals' decision, and we now reverse.

## II.

The doctors initially contend that the court of appeals erred in its construction of the insurance contracts they had with PHICO. According to the doctors, the tail endorsement to the claims-made policy could not be modified unilaterally by PHICO since the policy was continuous in nature. PHICO, on the other hand, argues that the policy was a one-year term policy, freely modifiable on renewal. Finding the policy to be ambiguous with regard to duration, the trial court construed the policy in favor of the doctors. On appeal, the court of appeals held that the policy was unambiguous as a matter of law and covered only a one-year period. We disagree.

Unless there is an ambiguity in the terms of a policy, a court will enforce the insurance contract as written. *Republic Ins. Co. v. Jernigan*, 753 P.2d 229, 232 (Colo. 1988). However, if a contractual provision is ambiguous, it is construed against the insurer who drafted the policy and in favor of the insured. *Chacon v. American Family Mut. Ins. Co.*, 788 P.2d 748, 750 (Colo.1990). In order to determine whether an ambiguity exists, a court must begin with the language of the policy, construed in light of the generally accepted meaning of the words employed and with reference to all provisions of the document. *Wota v. Blue Cross & Blue Shield*, 831 P.2d 1307, 1309 (Colo.1992). We treat a policy provision as ambiguous when it is reasonably susceptible to more than one meaning. *Northern Ins. Co. v. Ekstrom*, 784 P.2d 320, 323 (Colo.1989).

The key to determining the intended duration of this contract lies in construing the term "policy period," as used in the PHICO policy. The policy itself defines the term to mean "the policy period shown on the Declarations," and the declarations page contains the phrase "policy period," followed by a one-year time period. PHICO argues that this reference to a one-year period is dispositive and conclusively proves that each policy has a term of one year.

PHICO's argument ignores the fact that a single provision of an insurance contract cannot be read in isolation, but all of the provi-

sions must be considered as a whole. *Simon v. Shelter Gen. Ins. Co.*, 842 P.2d 236, 239 (Colo.1992). Contrary to PHICO's assertions, an examination of the entire contract reveals that the term "policy period" is ambiguous because it is reasonably susceptible to more than one meaning. *See Ekstrom*, 784 P.2d at 323. While "policy period" may refer to a one-year period on the declarations sheet of the policy, PHICO also uses the term to refer to multiple-year periods in other parts of the policy.

Significantly, PHICO uses the term "policy period" to refer to multiple years of coverage in its tail policy endorsement, the terms of which are at issue in this case. For example, contrary to the declarations sheet, the endorsement which PHICO issued in 1982 does not limit the term "policy period" to a single policy year. Rather, the endorsement states that "extended reporting period" or tail coverage "extends indefinitely the period for reporting claims arising from medical incidents *during the policy period.*" (Emphasis added). It then goes on to explain that tail premiums are "percentages of mature claims-made [4th year] premiums and increase *each policy year* for 3 years and then remain constant." (Emphasis added). If the term "policy period" were synonymous with "one year," then there would have been no need for the endorsement to distinguish between "policy period" and "policy year." This distinction only makes sense if PHICO intended for the phrase "policy period" in this context to refer to multiple policy years.[5]

The language PHICO uses throughout its tail policy endorsement further supports the view that the method of pricing tail coverage

contained therein would continue beyond a single policy year. The endorsement issued by PHICO in 1982 is illustrative. In this endorsement, PHICO states:

> Extended reporting form ("tail") premiums are percentages of MATURE CLAIMS-MADE [4th year] premiums and increase each policy year for 3 years and then remain constant. These percentages follow:
>
> | Policy year | Tail Premium |
> |---|---|
> | First Year | 79% |
> | Second Year | 112% |
> | Third Year | 118% |
> | Fourth Year (etc.) | 118% |

If PHICO had intended to limit the terms of the tail endorsement to the policy year shown on the declarations page, it could have done so.[6] However, by using the word "constant," and addressing the cost of tail coverage more than one year into the future, PHICO implied that the terms of the tail coverage offered would extend beyond a single policy year.

This conflict in the contract language is not confined to the tail policy endorsement, but can be found throughout the PHICO policy. For example, Form # M4–CO (rev. 10/83) issued by PHICO refers to calculation of the tail premium "based on the number of years a policy is in force." Here, "policy" is used in the singular, but refers to a period of "years." As the trial court noted in its order, this phrase belies PHICO's assertion that the policy was a one-year term policy.

Under the principles of contract interpretation outlined above, we believe that the duration of the PHICO policy is ambiguous.[7]

---

**5.** PHICO appears to concede that the term "policy period" in its tail endorsement refers to multiple-year periods. In its brief, for example, PHICO describes tail coverage in general as providing insurance for all "acts and omissions which occurred *during the period of continuous coverage with the carrier,*" but which are reported at some future time. (Brief of Respondent PHICO Insurance Company at 2) (emphasis added).

**6.** For example, Richard Laugesen, the doctors' insurance expert, testified that the language of the endorsement could have provided that the method of calculating the tail premium was "not guaranteed," or was "for this year only," or was "subject to change."

**7.** By finding the PHICO policy to be ambiguous, we simply hold that the duration of the policy is reasonably susceptible to more than one meaning. Since the duration of the PHICO policy is ambiguous, it must be construed against the insurer in accordance with well-settled rules of policy construction. *See, e.g., Simon v. Shelter Gen. Ins. Co.*, 842 P.2d 236, 239 (Colo.1992); *Chacon v. American Family Mut. Ins. Co.*, 788 P.2d 748, 750 (Colo.1990); *Republic Ins. Co. v. Jernigan*, 753 P.2d 229, 232 (Colo.1988). It is not necessary for us to resolve this ambiguity in order to decide this case. Hence, we decline to characterize the PHICO policy as a "continuous" claims-made policy.

PHICO used the term "policy period" in its policy to refer to two different time periods. The declarations page of the contract defines "policy period" as a one-year period, but the language used by PHICO in other portions of the policy and in the tail policy endorsement contemplates contractual obligations extending beyond a one-year period. Given this conflict, the trial court did not err in construing the policy against PHICO and in favor of the insured doctors.[8] *See Simon,* 842 P.2d at 242. When the policy is interpreted in this light, the trial court correctly determined that PHICO was bound by its promise to provide tail coverage at the rate initially contracted for, and breached this contract by later unilaterally changing the percentage and method by which the cost of tail coverage was calculated.

### III.

The next question before this court is whether the trial court erred in finding that PHICO engaged in fraud, negligent misrepresentation, and bad faith conduct with regard to its nonrenewal of its independent physician insureds in Colorado. PHICO contends that the fraud and negligent misrepresentation claims were legally insufficient, and that bad faith is limited to the context of insurance claims. We disagree with both of these contentions.

■ In order to prove fraud, a plaintiff must establish: (1) a false representation of a material existing fact; (2) knowledge on the part of the one making the representation that it is false; (3) ignorance on the part of the one to whom the representation is made of the falsity; (4) that the representation was made with the intention that it be acted upon; and (5) damage caused by the representation. *Kinsey v. Preeson,* 746 P.2d 542, 550 (Colo.1987). Similarly, the elements of fraudulent concealment are: (1) the concealment of a material existing fact that in equity and good conscience should be disclosed; (2) knowledge on the part of the party against whom the claim is asserted that such a fact is being concealed; (3) ignorance of that fact on the part of the one from whom the fact is concealed; (4) the intention that the concealment be acted upon; and (5) action on the concealment resulting in damages. *Ackmann v. Merchants Mortgage & Trust Corp.,* 645 P.2d 7, 13 (Colo.1982).

■ The trial court found that PHICO made misrepresentations and failed to disclose information falling into four categories: (1) misrepresentations about the longevity and stability of the company; (2) misrepresentations about the tail premium charges; (3) misrepresentations about the mature premium rate; and (4) misrepresentations about the rates being charged by PHICO.[9]

8. We also granted certiorari to consider the trial court's alternative holding that the policy should be construed in favor of the doctors under the doctrine of reasonable expectations. According to this doctrine, "[t]he objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations." *State Farm Mut. Auto. Ins. Co. v. Nissen,* 851 P.2d 165, 167–68 (Colo.1993) (quoting Robert E. Keeton, *Insurance Law—Basic Text* § 6.3, at 351 (1971)). Since we conclude that the trial court was correct in construing the PHICO policy in favor of the doctors because it was ambiguous, it is unnecessary for us to determine whether the same result could have been reached through application of the doctrine of reasonable expectations.

9. Specifically, the trial court made the following findings: (1) PHICO misrepresented that it would be available to the doctors throughout their retirement; (2) PHICO misrepresented that it was committed as a "partner" to the doctors; (3) PHICO failed to disclose that it was running off independent physicians; (4) PHICO misrepresented its financial position; (5) PHICO misrepresented that retirement benefits would be available to physicians who continued coverage with the company; (6) PHICO misrepresented that dividends would be available to the doctors; (7) PHICO misrepresented that it had specific expertise in providing insurance for doctors; (8) PHICO concealed its intent to nonrenew Colorado physicians while it accepted renewal premiums from the doctors; (9) PHICO misrepresented that the only time doctors would have to purchase a tail policy was when the doctors chose to leave the company; (10) PHICO misrepresented that the tail policy premium was a fixed percentage; (11) PHICO misrepresented that rates would remain stable under the claims-made policy; (12) PHICO misrepresented that the doctors would enjoy substantial cash flow savings; and (13) PHICO misrepresented that it was paying out claims far in excess of premiums paid.

Relying on its conclusions regarding the insurance contract, the court of appeals held that the doctors' claims based on misrepresentations of the tail premium charges, the mature premium rate, and the rates being charged by PHICO failed as a matter of law. The court of appeals stated that these misrepresentations were not actionable because a new contract was entered into each time a doctor renewed a policy, and that each doctor agreed to these changed terms upon renewal. *Ballow*, 841 P.2d at 351. As we held above, the court of appeals erred in its interpretation of the contract. Therefore, the insurance contract does not preclude these claims as a matter of law.

■ With regard to PHICO's representations about its stability and longevity, the court of appeals held that these were statements of opinion relating to future events, and as such, were not actionable.[10] *Id.* This conclusion, however, overlooks the history of the misstatements made by PHICO.

By October 1984, PHICO had established a policy of, and a timetable for, eliminating its independent physician book of business nationwide. At this same time, however, PHICO continually reassured the doctors of its commitment to Colorado. In an advertisement published in the Colorado Insurance News in October 1984, for example, PHICO described itself as a company "that will stand by you in the long run," and which was "in the market to stay." PHICO also specifically and individually reassured twenty-nine of the doctors that it intended to remain in Colorado even as the decision to nonrenew independent physicians was being finalized. One physician in particular renewed his policy on July 1, 1986, after receiving "very emphatic" assurance in early June that PHICO had no intention of leaving the state. Had he not renewed his policy, the cost of tail coverage would have been $26,484.

However, after renewing in 1986, his tail premium increased to $71,585.

Merely expressing an opinion in the nature of a prophecy as to the happening of a future event is not actionable. *Leece v. Griffin*, 150 Colo. 132, 135, 371 P.2d 264, 265 (1962). However, "[a] promise concerning a future act, when coupled with a present intention not to fulfill the promise, can be a misrepresentation which is actionable as fraud." *Kinsey*, 746 P.2d at 551 (quoting *Stalos v. Booras*, 34 Colo.App. 252, 256, 528 P.2d 254, 256 (1974)).

In this case, PHICO was not simply prophesying that it would be in Colorado, come what may. Instead, PHICO marketed itself saying that it *intended* to stay in Colorado for the long haul. While such statements may have reflected PHICO's true intent when it began doing business in Colorado, PHICO changed that intent over time due to perceived problems with the independent physician program. Thus, by October 1984, PHICO's commitment to Colorado may have existed with respect to certain sectors of the medical malpractice market (such as the hospital market), but it did not exist with regard to the independent physician sector. The trial court's findings and conclusions in this regard are not contrary to the evidence.

### IV.

■ The third issue before the court is whether PHICO engaged in bad faith insurance practices leading up to and culminating in the nonrenewal of all of the independent physicians insured by PHICO. PHICO argues that it does not have a duty of good faith toward its insureds in the nonrenewal or negotiation context. We disagree.

In *Farmers Group, Inc. v. Trimble*, 691 P.2d 1138 (Colo.1984), we recognized a claim for relief based on insurance bad faith in the context of a third-party insurance claim. Tort liability in that context

10. The court of appeals also held that the doctors could not show any damage from PHICO's misrepresentations regarding its stability and longevity. The court reasoned, "[t]here is no evidence that the physicians did not get that for which they had bargained. PHICO continued its coverage of each doctor through his policy period." *Ballow*, 841 P.2d at 352. At oral argument, PHICO likewise argued that the doctors received all the services to which they were entitled because they had the right to purchase tail coverage to cover future claims. This argument ignores, of course, the difference between the actual cost of these policies to the doctors, versus the represented and contractually-agreed-upon costs.

is grounded upon the special nature of the insurance contract and the relationship which exists between the insurer and the insured. The motivation of the insured when entering into an insurance contract differs from that of parties entering into an ordinary commercial contract. By obtaining insurance, an insured seeks to obtain some measure of financial security and protection against calamity, rather than to secure commercial advantage.

*Id.* at 1141. We held there that the applicable legal standard was whether the conduct of the insurer was reasonable.

In *Travelers Insurance Co. v. Savio,* 706 P.2d 1258 (Colo.1985), we extended this claim for relief to a first-party insurance claim. In that context, we stated that the plaintiff must also establish either knowledge on the part of the insurer that the conduct is unreasonable, or a reckless disregard for the fact that the conduct is unreasonable. *Id.* at 1276.

 This case raises the question of whether there is a place for an insurance bad faith claim outside the scope of the insurance claims setting. PHICO argues that insurance bad faith does not apply outside the claims context. We disagree.

 It is the nature of the relationship created by the insurance contract, rather than the activity involved, which determines if the duty of good faith and fair dealing exists. And, as we stated in *Savio,* this relationship "permeates *all* of the dealings of the parties." *Id.* at 1268 (emphasis added). Moreover, it is the policy of this state, announced in section 10–1–101, 4A C.R.S. (1987), that all persons providing insurance services to the public must "be at all times actuated by good faith in everything pertaining thereto." This duty is not limited, as PHICO argues, merely to the claims or cancellation contexts. Instead, the duty, as formulated by the General Assembly, is a broad and wide-ranging one, extending to "everything pertaining" to the provision of insurance services to the public.

 As a general principle, we agree that an insurer may choose to nonrenew an insured for any reason.[11] *Buell v. Security Gen. Life Ins. Co.,* 779 F.Supp. 1579, 1581 (D.Colo.1991), *aff'd,* 987 F.2d 1467 (10th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 308, 126 L.Ed.2d 255 (1993). However, an insurer is required to act in good faith when carrying out its decision not to renew either a single insured or entire blocks of business. In this setting, we believe that good faith should be measured according to the legal standard used in the first-party claims context: unreasonable conduct and either knowledge or reckless disregard of the unreasonableness of the conduct. *See Savio,* 706 P.2d at 1276; *Hartford Fire Ins. v. Colorado Div. of Ins.,* 824 P.2d 76, 80–81 (Colo.App.1991), *cert. denied* (Feb. 18, 1992).

It is clear that the trial court did not err in holding that PHICO breached its duty of good faith by knowingly engaging in an unreasonable pattern of conduct.[12] As in the *Hartford* case, PHICO enticed the doctors to purchase claims-made coverage through promises of longevity and assurances that the terms and method of calculating the premium for a tail policy would be fixed. It then undermined these promises by unilaterally changing the terms of the tail policy to discourage renewal by the doctors, and without disclosing its plan to nonrenew them. Instead, PHICO continued to reassure doctors that it had no intention of leaving the state in the several months prior to its withdrawal from the Colorado market. Rather than dealing with the doctors in good faith once it decided not to renew them, PHICO concealed its intention and actively misled the doctors to their detriment.

---

11. Whether this general principle is limited, as in the employment-at-will context, to any reason which is not repugnant to public policy is not before the court.

12. At trial, PHICO argued that its actions were dictated by business necessity and were therefore reasonable. The trial court, however, found this argument to be "simply not credible." PHICO allegedly suffered its first bad individual underwriting year in 1984. However, in that same year, "PHICO started a $15 million building project for a new home office and distributed stock to its top management in recognition of their contribution to the success of PHICO." (Trial Court Order at 242).

## V.

Finally, we granted certiorari to determine whether this court should address certain damages issues raised by the physicians on cross-appeal, or whether these issues should be remanded to the court of appeals. At the present time, we decline to address the damages issues raised by the physicians for several reasons. First, we lack the proper legal and factual foundation to do so. The parties were unable to fully explore these issues before this court due to briefing limitations. Moreover, we cannot fully resolve this case without also considering the numerous damages issues raised by PHICO on appeal. Since the court of appeals reversed the trial court and found in favor of PHICO, it was not necessary for the court of appeals to consider PHICO's appeal on damages. However, since our decision today upholds the trial court's judgment in favor of the physicians, PHICO's damages issues, as well as the doctors' damages issues, must be addressed.

In the interests of judicial economy, we also decline to remand this case to the court of appeals for determination of the damages issues raised by the parties. Therefore, we will decide all damages issues in a separate opinion and, prior to our decision, the parties will be directed to fully brief these issues by further order of the court.

## VI.

In summary, we conclude that the court of appeals erred in holding that the duration of the PHICO policy was unambiguous. The term "policy period" is ambiguously defined and used in the policy, and should have been construed in favor of the doctors. We also conclude that PHICO fraudulently misrepresented its intentions with regard to its commitment to serving the independent physician market in Colorado, and that PHICO

engaged in bad faith insurance practices under the circumstances in which it nonrenewed the independent physicians. Accordingly, we reverse the court of appeals. We retain jurisdiction over this matter, and the parties will be directed to fully brief all damages issues by subsequent order of this court.

ERICKSON, J., specially concurs in the result, and SCOTTS, J., joins in the special concurrence in the result.

Justice ERICKSON specially concurring in the result:

I specially concur in the reversal of the court of appeals, but for reasons that differ in some respects from those set forth in the majority opinion. I agree with the majority that the court of appeals erred in deciding the insurance contract was unambiguous. I would hold the insurance contracts between the physicians and PHICO Insurance Company (PHICO) were continuous contracts breached by PHICO.

### I

A civil action was commenced by 105 "independent physicians" against PHICO for damages based on fraud, breach of contract, negligent misrepresentation, bad faith, and interference with contract and prospective business opportunities.[1]

The controversy centers on PHICO's sale and subsequent termination of a "Physicians Professional Liability Policy" that provided "claims-made" coverage to the plaintiff-physicians.[2] Upon termination of the liability policy, a doctor would have coverage for incidents occurring during the policy period but not reported as claims until after the date of termination only if he or she purchased reporting period (tail) coverage. PHICO of-

---

1. An employed physician is a physician who is employed by a hospital. An independent physician is a physician who has his or her own private practice. Independent physicians have privileges at hospitals but are not employed by them. Each of the 105 plaintiffs is an independent physician.

2. The policy in this case provides coverage for "a medical incident occurring during the policy period and subsequent to the initial effective date shown in the Declarations, for which claim is first made against the insured and reported to the Company during the policy period." "Claims-made" coverage is discussed *infra* part II.

fered tail coverage based upon a percentage of the fourth-year "mature rate."[3]

The parties tried this case to the court. Following a six week trial, the trial judge entered a 294 page order on September 5, 1989, containing findings of fact, conclusions of law, and a judgment for the plaintiff-physicians. The court of appeals reversed the trial court and found for the defendant, PHICO.

We granted certiorari to review the decision of the court of appeals in *Ballow v. PHICO Insurance Co.*, 841 P.2d 344 (Colo. App.1992).

## II

PHICO is owned by the Hospital Association of Pennsylvania and was established in Pennsylvania in 1976 to insure Pennsylvania hospitals and physicians employed by local hospitals. Although PHICO primarily insured hospitals, in 1978 it decided to expand its business to include insuring independent physicians. In 1979, PHICO wrote its first independent physician policy in Pennsylvania. PHICO was licensed to do business in Colorado on March 25, 1980, and began marketing a policy in Colorado in the spring of 1981.

The first PHICO independent physician policy was sold in Colorado on February 1, 1982. By November 1, 1984, PHICO had ceased accepting new independent physician business but continued to write new policies for hospitals. In 1985, PHICO established a plan to reduce the number of independent physicians insured but maintained its stance that it would continue to insure the doctors already receiving coverage. Also in 1985, PHICO increased the percentage of the fourth-year mature rate required to buy a tail policy. On June 18, 1986, PHICO decided not to renew any of the independent physician business. On July 12, 1986, PHICO sent a letter to its insured independent

physicians providing notice of its decision to withdraw from the Colorado market. Most of the doctors had a renewal date of July or earlier so they had already renewed when they were informed of the withdrawal and the increased cost to purchase a tail policy.

## III

In order to determine if the insurance policy provided by PHICO to the independent physicians was breached by PHICO, it is first necessary to analyze the type of policy written by PHICO and the purpose behind this type of liability policy. I would not interpret the contract in favor of the insureds and then find a breach, as the majority does, but would address the nature of the policy and conclude that there was a purpose and intent shared by both parties and that a breach occurred. The examination of the type of policy written by PHICO yields essential insight into why this type of policy must be treated as a continuous policy.

### A. Types of Medical Malpractice Coverage

As the majority points out, there are two general types of medical malpractice insurance available to individual doctors—"occurrence" and "claims-made." Generally, "[a]n 'occurrence' policy protects the policyholder from liability for any act done while the policy is in effect, whereas a 'claims-made' policy protects the holder only against claims made during the life of the policy." *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 535 n. 3, 98 S.Ct. 2923, 2926 n. 3, 57 L.Ed.2d 932 (1978). The act which triggers coverage under an occurrence policy is the act or omission itself—if the liability inducing event occurs during the policy period, the insured is indemnified regardless of when the claim is brought. Conversely, the act which determines coverage under a claims-made insurance policy is the assertion of the claim during the policy period. One type of claims-

---

**3.** From 1982 to April 1985, the following endorsement was issued with the policy:

... Extended reporting period form ("tail") premiums are percentages of mature claims-made (fourth-year) premiums and increase each policy year for 3 years and then remain constant. These percentages follow:

| Policy Year | Claims–Made Policy Premium | Tail |
|---|---|---|
| Premium | | |
| First Year | 28% | 79% |
| Second Year | 56% | 112% |
| Third Year | 80% | 118% |
| Fourth Year | 89% | 118% |

made policy provides coverage for claims made during the policy period no matter when the alleged act or omission occurred.[4] *See Mutual Fire, Marine & Inland. Ins. Co. v. Vollmer,* 306 Md. 243, 508 A.2d 130, 134–35 (1986) (stating that claims-made policies provide indemnity during the policy term no matter when the alleged error or omission or act of negligence occurred); *Stine v. Continental Cas. Co.,* 419 Mich. 89, 349 N.W.2d 127, 130 (1984) (same). *See also Gereboff v. Home Indem. Co.,* 119 R.I. 814, 383 A.2d 1024 (R.I.1978) (involving a policy written to cover all claims made during the policy period regardless of when the event giving rise to the liability claim occurred). An insurer may modify a claims-made policy and limit coverage only to a certain range of occurrences by creating a "retroactive date." All events that occur prior to the retroactive date are outside the scope of coverage even if the claim is made while the policy is in force.[5]

Some insurers offer policies that have a retroactive date identical to the beginning of the coverage with the insurer. This type of policy is a combination of claims-made and occurrence policies. This type of claims-made coverage (hybrid claims-made policy) covers negligent acts or omissions which occur *and* are the subject of a claim during the policy period.[6] *See Stine,* 349 N.W.2d at 134 (involving a policy written to cover only claims which are made and occur within the policy period).

From the standpoint of the insured, hybrid claims-made policies contain the worst characteristics of both claims-made and occurrence policies, and the best of neither. Hybrid claims-made policies provide neither the prospective protection of an occurrence policy nor the retroactive coverage of a claims-made policy with no retroactive limit. Prospective or retroactive coverage must be purchased to supplement the hybrid claims-made coverage in this case.[7] The distinction

4. For a description of the difference between claims-made and occurrence policies, *see* Andrew S. Hanen & Jett Hanna, *Legal Malpractice Insurance: Exclusions, Selected Coverage and Consumer Issues,* 33 S.Tex.L.J. 75 (1992); Katharine Rosenberry & Clifford J. Treese, *Purchasing Insurance For the Common Interest Community,* 27 Wake Forest L.Rev. 397 (1992); Carolyn M. Frame, *"Claims–Made" Liability Insurance: Closing the Gaps With Retroactive Coverage,* 60 Temp.L.Q. 165 (1987); John K. Parker, *The Untimely Demise of the "Claims Made" Insurance Form? A Critique of Stine v. Continental Casualty Company,* 1983 Det.C.L.Rev. 25, 27–28; Sol Kroll, *The Professional Liability Policy "Claims–Made",* 13 Forum 842, 843 (1978). Each source states that a claims-made policy covers all claims made during the policy period for acts or omissions regardless of when the liability inducing event occurs.

5. This type of policy was involved in *Mutual Fire, Marine & Inland Insurance Co. v. Vollmer,* 306 Md. 243, 508 A.2d 130, 136 (1986) where the policy became effective on August 1, 1977, and was retroactive only to August 1, 1975. The difference among claims-made policies is often the 'retroactive date.' The retroactive date is the date that defines coverage for claims arising before the inception of the policy in effect at the time the claim is made. If the event occurred before the retroactive date, the claims-made policy will not provide coverage. The insurer is free to impose whatever retroactive date it chooses subject to the request and acceptance of the insured. *See* Donald S. Malecki & Arthur L. Flitner, *Commercial General Liability: Claims-*

*made and Occurrence Forms* 76–77 (3rd ed. 1990).

6. An excellent description of the types of policies is set forth in Parker, *supra* note 4, at 27–28 (footnotes collecting cases omitted) which states:

Generally speaking, "occurrence" policies cover liability inducing events occurring during the policy term, irrespective of when an actual claim is presented. Conversely, "claims-made" (or "discovery") policies cover liability inducing events if and when a claim is made during the policy term, irrespective of when the events occurred. There are, of course, hybrids of the two varieties.

As the majority correctly notes, the hybrid claims-made policy has been held unconstitutional as a violation of public policy in at least one jurisdiction when the insured's objectively reasonable expectation was that he was the beneficiary of a claims-made policy which covered claims made irrespective of when the events occurred. *See Sparks v. St. Paul Ins. Co.,* 100 N.J. 325, 495 A.2d 406 (1985). However, the policies at issue in this case, unlike the policy in *Sparks,* provided mechanisms (for a price) for both prospective and retroactive coverage. Therefore, the constitutional difficulty encountered in *Sparks* is not present here because the plaintiffs were not under a reasonable expectation that they were the beneficiaries of claims-made policies that covered all claims irrespective of when the events occurred.

7. If the prior policy was an occurrence policy or the doctor was being insured for the first time, no additional retroactive coverage would be needed.

is critical to the analysis inasmuch as the type of coverage in this case is both occurrence and claims-made and emphasizes the essential purpose behind the coverage offered by PHICO. The insurance policies purchased by the physicians in this case were hybrid claims-made policies.[8]

## B. The Rationale of Claims–Made Policies

Claims-made policies are a fairly recent development and were created primarily in response to situations in which the event or occurrence giving rise to liability is difficult to pinpoint. *Vollmer*, 508 A.2d at 135. Occurrence policies were inadequate instruments with which to deal with the long and open "tail" exposure presented by an extended or undefined liability-inducing event. Donald S. Malecki & Arthur L. Flitner, *Commercial General Liability: Claims-made and Occurrence Forms* 12 (3d ed. 1990). Claims-made policies allow underwriters to define their exposure and accurately set premiums and reserves. The accuracy is the result of the insurer's ability to limit liability to claims actually made during the term of the policy for which the premium is computed. *Vollmer*, 508 A.2d at 135. "As a result, the insurer is better able to predict the limits of its exposure and more accurately estimate the premium rate schedule necessary to accommodate the risk undertaken." *Stine*, 349 N.W.2d at 131. Hybrid claims-made policies further restrict the exposure of insurance carriers by limiting the coverage to occurrences and claims made during the policy period.

When an insured's coverage under a claims-made policy is terminated, or not renewed, the insured may purchase coverage for claims that arose during the policy period but were subsequently asserted. The subsequent coverage is called a "tail policy" or "retroactive reporting coverage" and in effect converts a claims-made policy into an occurrence policy. The tail policy provides coverage for all acts and omissions during the period of continuous coverage with the claims-made carrier, regardless of when the claim is reported in the future.[9] An alternative to tail coverage, where available, is "prior acts" coverage. A prior acts policy is essentially tail coverage offered by the subsequent carrier.[10]

## C. The Rationale of Hybrid Claims–Made Policies

Hybrid claims-made policies are marketable despite their shortcomings because they reduce the insured's premiums in the first several years. Statistics show that only a small percentage of claims that arise within the policy period are reported in the first year of coverage. Therefore, the insurance companies charge lower premiums for the first year. In the second year of coverage, a hybrid claims-made policy covers all claims reported during the second year that occurred either in the first or second year. Therefore, the second-year premium is higher than the first-year premium. The third year of coverage encompasses all claims reported in the third year that occurred during the first, second, and third years. The fourth-year rate, also known as the "mature

---

8. Insurance policies are to be interpreted according to the language in the policy. Although the insurance policy face sheet defines the policy as a "claims-made policy," the fact that the language of the policy states it only covers events which occur during the policy period and which are reported during the policy period make this a hybrid claims-made policy.

9. The tail policy is so important to providing adequate coverage for a claims-made policy or a hybrid claims-made policy that the option to purchase a tail policy is now required by statute. § 10–4–419, 4A C.R.S. (1987 & 1993 Supp.). This statute was not in effect when the events in this case occurred.

10. Prior acts coverage was not feasible for the independent physicians in this case. By the time PHICO announced its withdrawal, the primary medical malpractice provider, the Hartford Insurance Company, had also withdrawn. The primary remaining insurer was COPIC Trust which did not have enough surplus to absorb the additional premium from the influx of insurance applications. COPIC Trust did not offer prior acts coverage.

Later in 1986, the Doctor's Company was admitted to Colorado. Some of the independent physicians purchased prior acts coverage from the Doctor's Company instead of buying a tail policy from PHICO. In order to obtain prior acts coverage, the doctors had to pay the "mature" premium rate instead of a first year rate.

rate," levels out because statistics show most claims arising out of the prior years will be reported within the first four years. Such policies are attractive because the insureds realize significant premium savings in the early years.[11]

The physicians in this case purchased hybrid claims-made policies and tail options with the belief they would realize savings over several years and would be covered when they terminated their policies. The underwriters sold the hybrid claims-made and tail policies to enable them to limit their exposure and to accurately set reserves and compute premiums. The character of the policies at issue in this case shows the shared intent of both parties to enter a long-term hybrid claims-made insurance contract.

### D. The Hybrid Claims–Made Policy Is Ambiguous

An insurance policy is a contract and the standard rules of contract construction apply. *Republic Ins. Co. v. Jernigan*, 753 P.2d 229, 232 (Colo.1988). Insurance contracts are to be interpreted and read according to the terms of the policy. A contract is ambiguous only if it is reasonably and fairly susceptible of more than one meaning. *Terranova v. State Farm Mut. Auto. Ins. Co.*, 800 P.2d 58, 60 (Colo.1990). A mere disagreement between the parties does not create ambiguity. *Id.* When a contract is ambiguous, extrinsic evidence may be admitted to clarify the meaning of the terms and to ascertain the parties intentions. *Kuta v. Joint Dist. No. 50(J)*, 799 P.2d 379, 382 (Colo.1990); *Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310, 1314 (Colo.1984).

As the majority points out, the terms in the declaration and endorsements create a conflict and make the contract ambiguous. The declaration indicated that each year was a separate and distinct policy year, while the

endorsements suggest a continuous policy. The trial court found the contract to be ambiguous:

> The obvious conflict here is between the declarations of the policy, which clearly establish a one-year period of the policy, and the endorsements, which equally clearly establish a percentage rate and a method of calculation which extends into the future.

Because an insurance policy and an endorsement are considered a single instrument, *Martinez v. Hawkeye–Security Insurance Co.*, 195 Colo. 184, 576 P.2d 1017 (1978), the policy is ambiguous as to whether the insured has one continuous policy or several year-long policies.[12]

Ambiguity in a contract should first be resolved by attempting to give effect to the intent of the parties.[13] *See Martinez v. Continental Enterprises*, 730 P.2d 308 (Colo. 1986); *Pepcol Mfg. Co.*, 687 P.2d at 1313; *Spillane v. U.S. Fidelity & Guaranty Co.*, 137 Colo. 385, 325 P.2d 700, 704 (1958) (stating in seeking to determine the legal effect of a policy, the court should endeavor to determine what the parties had in mind at the time of procuring the insurance policy); *see also Massachusetts Bonding & Ins. Co. v. Board of County Comm'rs*, 100 Colo. 398, 68 P.2d 555 (1937) (holding whether a renewal of an insurance contract creates a new and independent contract or a continuation of the original contract depends on the intent of the parties). In my view, it is not necessary to reach the conclusion that an ambiguous contract is construed against the drafting insurer. While it is true that ambiguous contract terms must be read in favor of the insured, *Republic Insurance Co.*, 753 P.2d at 232, whether the renewal of an insurance contract creates a new and independent contract or a continuation of the original contract depends upon the intent of the parties. *Massachu-*

---

11. PHICO marketed their policy by noting the savings to doctors.

12. An endorsement attached to an insurance policy is the last expression of intent and prevails if it conflicts with the language of the policy. *Martinez v. Hawkeye–Security Insurance Co.*, 195 Colo. 184, 187, 576 P.2d 1017, 1019 (1978).

13. Resolution of the central issue in this case does not require reading the contract in favor of one party. If we can read the contract so that it carries out the intent of both parties, we do not need to construe it against a party. Construing a contract against a party should be reserved for situations in which no plain meaning can be found and no common intent can be ascertained.

*setts Bonding & Ins. Co.,* 100 Colo. at 399, 68 P.2d at 556; *see also* 18 George J. Couch, *Cyclopedia of Insurance Law* § 68.40 (2d rev. ed. 1983) (footnotes omitted) ("Whether the renewal of a policy constitutes a new and independent contract or continuation of the original contract primarily depends upon the intention of the parties as ascertained from the instrument itself.").

In this case, the evidence supports the trial court's finding that the parties intended the hybrid claims-made policy to be a continuous policy.[14] The trial court stated:

> Thus, the Court must determine whether the intention of the parties was that the successive renewals of the PHICO policy were a continuation of a single contract such that PHICO was bound by the express terms of the original policy, or whether these were separate and distinct contracts of insurance subject to unilateral modification at the time of renewal with notice to the insured.... Accordingly, the Court has considered the marketing literature and oral and written representations made by PHICO and its agents, and relied upon by physicians, in construing the intent of the parties.
>
> ....
>
> ... [T]he Court finds the intent of the parties was to create a contract which would bind the parties to the tail percentages denoted in the original endorsement. This result is amply buttressed by a review of the evidence adduced from the advertising literature and the testimony of the parties themselves.

The purpose and the language of the policy, as well as the tail policy provisions, indicate that the intent of the parties was to create a continuous policy.

In addition, the purpose behind buying and selling the liability insurance reflects that the parties intended the hybrid claims-made policy to be continuous. The hybrid claims-made policies provide coverage over a number of years at a rate substantially discounted over the first several years. The policies provide a savings to the insured and limit and define exposure of the insurer. If the policies are not continuous and do not reach maturation, they do not serve their purpose to the insured. While the hybrid claims-made policy is sold on an annual basis, there is a sequential or cumulative effect from year to year in terms of risk assumed, the cost of that risk, and the cost of a tail policy for the extension of coverage. The underwriters compute the exposure over the years to maturation and establish the premiums and tail rates accordingly. The trial court found:

> [A] review of the testimony of the 105 plaintiffs reveals tellingly that each doctor was under the impression, in fact had been led to believe, that the tail percentage was "fixed," "poured in concrete," etc. The evidence is clear that the endorsement was propounded by the defendant to calm fears and allow the insureds to avoid the many pitfalls of a new and relatively unusual type of insurance coverage.

The insurers then market the hybrid claims-made policies as a substantial savings over time. The physicians intended the contract to protect them over a period of years, and PHICO offered long-term coverage so that it could assume a calculated risk over the same period.

The language of the policy also suggests a continuing contract. The policy itself encompasses all prior years and covers a "medical incident occurring during the policy period" for the purposes of defining when an occurrence is covered under the policy.[15] The retroactive date is set from the first day of the insurance coverage with PHICO, not at

---

**14.** The trial court recognized the conflict between the declaration, which suggests a one-year term, and the endorsements, which suggest a continuous policy, stating:

> The insurance contracts in this case are reflective of the fundamental conflict between occurrence and claims-made philosophies. The declaration and the body of the contract harkens back [to] (and, in fact, seems to borrow language from[ ) ] the earlier occurrence concept, while the endorsement and descriptive language thereto foreshadows the difficulty of the claims-made concept.

**15.** Specifically, the contract provides:

> Individual Professional Liability: The Company will pay on behalf of the insured all sums which the insured shall be legally obligated to pay as damages because of injury to which this insurance applies caused by a medical incident occurring during the policy period and subsequent to the initial effective date shown in the

the beginning of each year, thereby providing coverage for occurrences and claims made during coverage by PHICO. If the "policy period" is only one-year, then the hybrid claims-made coverage under the policy does not extend to prior years of claims-made coverage. Under a single-year construction, a "medical incident" occurring in year two of the claims-made policy coverage would not be covered if reported during year three of claims-made coverage. This construction would defeat the entire purpose of obtaining claims-made malpractice insurance.

Finally, the tail policy provisions indicate the intent of the parties to create a continuous policy. The tail policy rate was a one time charge contingent on the year in which the policy was terminated, or not renewed, and measured against the fourth-year mature rate. The rate was specified with respect to which year the insured left and not stated merely as a percentage if the tail policy was purchased at the end of a specific contract year.[16] The trial court found, by examining a 1983 letter from a PHICO agent to a physician's group:

> The tail charge needs to be paid if you move your coverage to another carrier.... The tail charges are guaranteed in the policy and are in no way subject to underwriting whims.

Therefore continuous, rather than term coverage is intended and provided. As the plaintiffs and the insurance agents that sold the policy testified at trial, the policy was sold as a "four year package" deal.

As the majority explains, some of the provisions in the policy and endorsements suggest that the policy was an extended package or the continuation of a single contract. When the contract is interpreted based on the intent of the parties as a continuous policy, it can be seen that the trial court correctly found that PHICO was bound by the terms of the original contract and unilaterally breached the contract by changing the terms of the tail policy provisions.

## IV

I agree with the majority affirmance of the trial court finding that PHICO engaged in fraud, misrepresentation and bad-faith conduct with regard to its nonrenewal of its independent physician insureds in Colorado. The court of appeals held that these were statements of opinion relating to future events, and therefore not actionable. As the majority points out, however, a promise concerning a future act, coupled with the present intent not to fulfill the promise, can be misrepresentation actionable as fraud. *Citing Kinsey v. Preeson,* 746 P.2d 542, 551 (Colo.1987). I write to clarify the basis on which I support the result reached by the majority.

PHICO marketed the malpractice policy by representing it was a stable organization that intended to provide insurance in Colorado well into the future. The trial court found:

> The representation that PHICO would be in Colorado for the long-haul was particularly important because of the claims-made insurance contract. The claims-made contract is premised on the understanding that the insured would stay with the company for a number of years, and at retirement would purchase a tail policy. Nearly every doctor testified that they intended to purchase a tail policy "one time" in their career—at the time of their retirement. This understanding was implicit in PHICO's representations that the purchase of a tail policy was a "one time" event.

Throughout PHICO's involvement in the insurance business in Colorado, PHICO mar-

---

Declarations, for which claim is first made against the insured and reported to the Company during the policy period, arising out of the practice of the insured's profession as a physician or dentist.
(Emphasis removed.)

**16.** In April 1985, PHICO made the following endorsement:
Tail premium percentages applicable during *the policy period of this policy* are provided below for your information:

| Year | Tail Premium Percentages |
|------|--------------------------|
| First Year | 89% |
| Second Year | 134% |
| Third Year | 140% |
| Fourth Year | 140% |

(Emphasis added.) A second year policy could have alternatively simply read "you may purchase a tail policy at 134% of what would have been the fourth-year rate."

keted itself and specifically its hybrid claims-made policy by promising PHICO would be in Colorado for the long haul. PHICO's 1984 marketing plan stated: "We know full well the consequences to policyholders when carriers pull in and out of the market. We don't do that." PHICO claimed it was a "company that will stay by you in the long run," and they were "in the market to stay." PHICO also asserted: "We have a permanent commitment to remain and work with our policyholders as partners in the future." In marketing its hybrid claims-made policies in 1985, PHICO represented that it had to raise its rates so that "it can remain viable to meet the insureds' needs in the long run."

Additionally, when rate increases were announced in the spring of 1985, PHICO justified such rate increases on the basis that the increases would make it possible for PHICO to cover the independent physicians into the future. However, PHICO had decided in October 1984 to begin to eliminate coverage for independent physicians and then purchased advertising space in commercial journals declaring that PHICO would be available to physicians in the long run. The representation that PHICO would cover physicians into the future was especially important in light of the nature of the hybrid claims-made policies purchased by the physicians. Only if PHICO remained in business could the physicians purchase the tail policy.

The promise to remain in Colorado into the distant future was coupled by a present intent not to fulfill that promise. For example, PHICO continued to represent that it was stable and would stand behind the physicians in the long run, even though it was reducing its coverage of independent physicians, raising rates and renewing policies in preparation to leave the Colorado market. The trial court found:

> PHICO's representations that it would be available for the "long haul" continued up to the date of its announcement of withdrawal from the Colorado market. In June 1986, a number of physicians, con-

cerned about the announced withdrawal of the Hartford Insurance Company from the Colorado market called PHICO's agents and brokers to inquire into the possibility of similar action by PHICO. As late as this time, the defendant continued to reassure the doctors that they had no intention of leaving the state. It is extraordinary to note, after a review of the individual doctor's findings of fact, that *26 of the plaintiff doctors* were specifically reassured in the several months prior to the PHICO withdrawal that PHICO would stay in the Colorado market.

I agree with the majority's holding that PHICO's unfulfilled promises to stay in Colorado amounted to fraud. The trial court found, based on the evidence in the record, that PHICO did not intend to fulfill its promises.

### V

The trial court found that PHICO engaged in bad-faith insurance practices leading up to and culminating in the nonrenewal of the physician's insurance policies. The court of appeals, however, drew a distinction between an insurance company's obligations toward its insureds when it is deciding not to renew an insurance policy and its obligations toward its insureds in other stages of the insurer-insured relationship.[17] The majority disagrees with the court of appeals and extends the good-faith requirement of insurers to encompass the insurer's decision to renew. I write separately to point out why the good-faith requirement exists outside the claims context and to state my view that the majority's application of the good-faith requirement should be limited to the facts in this case.

It is the express policy of the state that all insurers act in good faith in all matters pertaining to the business of insurance. The insurer's duty to act in good faith is set forth in section 10–1–101, 4A C.R.S. (1987) as follows:

> **Legislative Declaration.** The general assembly finds and declares that the purpose of this title is to promote the public welfare by regulating insurance to the end that

---

17. The court of appeals stated:

[W]hen an insurer decides not to renew a policy, it has already fully performed its contract and there no longer exists that special relationship giving rise to a duty of good faith.

*Ballow v. PHICO Ins. Co.,* 841 P.2d 344, 353 (Colo.App.1992).

insurance rates shall not be excessive, inadequate, or unfairly discriminatory, to give consumers thereof the greatest choice of policies at the most reasonable cost possible, to permit and encourage open competition between insurers on a sound financial basis, and to avoid regulation of insurance rates except under circumstances specifically authorized under the provisions of this title. Such policy requires that all persons having to do with insurance services to the public *be at all times actuated by good faith in everything pertaining thereto,* abstain from deceptive or misleading practices, and keep, observe, and practice the principles of law and equity in all matters pertaining to such business.

(Emphasis added.) In *Travelers Insurance Co. v. Savio,* 706 P.2d 1258, 1268 (Colo.1985), the court noted that the duty of good faith "permeates all of the dealings" between the insurer and the insured. The duty to act in good faith is unequivocal and is not limited to certain stages of the insurer-insured relationship, including the insurer's decision not to renew.

Nevertheless, an insurer may choose not to renew an insurance policy for any reason unless the insurance policy provides otherwise. *Buell v. Security Gen. Life Ins. Co.,* 779 F.Supp. 1579, 1581 (D.Colo.1991), *aff'd,* 987 F.2d 1467 (10th Cir.1993), *cert. denied* —— U.S. ——, 114 S.Ct. 308, 126 L.Ed.2d 255 (1993). If there is no clause in the policy granting a privilege or imposing a duty of renewal, neither party has an absolute right to require renewal. Thus, the rights of the parties under a contract are mutual in the sense that neither is bound to renew the contract. Under such a policy, the insurer may decline to renew the policy at the end of a premium payment period. 18 George J. Couch, *Cyclopedia of Insurance Law* § 68.12 (2d rev. ed. 1983). The reason

behind this policy is parties should have the right to contract freely within the bounds of decency and public policy.

A general limitation of the ability of an insurer to contract, or not to contract, for what ever reason would be an impermissible and unwise invasion into the business judgment of the insurance carrier. Accordingly, the Colorado cases addressing bad faith uniformly focus on an insurer's claims handling practices and not on the renewal of a policy.[18] *See American Cas. Co. v. Glaskin,* 805 F.Supp. 866 (D.Colo.1992) (applying Colorado law) (permitting an insured to sue where the insurer unreasonably denied coverage under the terms of a policy); *Travelers Ins. Co.,* 706 P.2d at 1274 (allowing an insured to sue in tort where the insurer unreasonably and knowingly denies or delays payment of an insured's claims); *Farmers Group, Inc. v. Trimble,* 691 P.2d 1138 (Colo.1984) (holding that an insurer who unreasonably and in bad faith denies or delays payment of a claim may be liable for bad faith); *Rederscheid v. Comprecare, Inc.,* 667 P.2d 766 (Colo.App. 1983) (permitting an insured to sue in tort where the insurer unreasonably and knowingly denies or delays payment of an insured's claims). To date, no jurisdiction has expanded the good-faith requirement to include the making or pricing of a contract, even in the nonrenewal context.[19]

Although parties have a liberal right to contract freely, the nature of the claims-made coverage suggests that there should be some type of good-faith limitation on renewal of such policies albeit modified by acknowledgment of the essential right to freedom of contract and business judgment. Claims-made insurance discourages competitive shopping at the time of renewal. To change carriers, an insured is required to purchase a tail policy as well as pay the premium for the new insurance. It makes the policyholder a virtual economic captive of the insurer. The

---

18. Other jurisdictions also recognize the good-faith requirement for the cancellation of policies as well as for claims handling practices. *See, e.g., L'Orange v. Medical Protective Co.,* 394 F.2d 57 (6th Cir.1968) (stating that cancellation of a malpractice policy violated public policy where cancellation was for purpose of coercing and intimidating dentist as a witness in a pending malpractice suit); *Gahres v. PHICO Ins. Co.,* 672 F.Supp. 249 (E.D.Va.1987) (holding the cancellation of a policy may require good faith while

nonrenewal raises no obligations for the insurer); *Spindle v. Travelers Ins. Co.,* 66 Cal.App.3d 951, 136 Cal.Rptr. 404 (1977) (stating it was bad faith to cancel a malpractice policy to make an example to other insureds and induce them to pay higher premiums).

19. Other jurisdictions which have addressed the issue presented here have held that, as a matter of law, insurance companies have no obligation to renew an insurance policy absent a statutory

unique nature of claims-made insurance gives rise to heightened duties during renewal negotiations because claims-made insurance contemplates a continuing relationship between the parties.

I agree, therefore, with the majority's conclusion that the good-faith requirement extends beyond the cancellation and claims context to the nonrenewal context.

For the forgoing reasons I specially concur in the reversal of the court of appeals for reasons that differ in some respects from those set forth in the majority opinion.

I am authorized to say that Justice SCOTT joins in the special concurrence in the result.

or contractual obligation. *Gahres,* 672 F.Supp. at 253; *Travelers Ins. Co. v. Lesher,* 187 Cal. App.3d 169, 231 Cal.Rptr. 791 (1986); *Coira v. Florida Medical Ass'n, Inc.,* 429 So.2d 23 (Fla. App.1983); *Egnatz v. Medical Protective Co.,* 581 N.E.2d 438 (Ind.App.1991); *Gautreau v. Southern Farm Bureau Cas. Co.,* 429 So.2d 866 (La. 1983); *Madden v. Indiana Lumbermen's Mut. Ins. Co.,* 451 S.W.2d 764 (Tex.App.1970); *Armstrong v. Safeco Ins. Co.,* 111 Wash.2d 784, 765 P.2d 276 (1988). The application of the good-faith requirement in the cancellation and claims adjusting contexts as opposed to the nonrenewal context is that during cancellation or adjusting, the insurer is acting under the terms of the contract. When the insurer exercises its decision whether to renew, the contract has been fully performed and no further obligation exists under the contract. *See Gahres,* 672 F.Supp. at 253.