Edward BALLOW; Foot Associates, P.C.; Mark P. Berland; Richard N. Bernhardt; Richard N. Bernhardt, M.D., P.C.; Leonard D. Bernstein, The OB/GYN Associates, P.C.; J. Tashof Bernton; J. Tashof Bernton, M.D., P.C.; Roland J. Brandt; High Country Orthopedic Associates of Colorado Springs, P.C.; Robert A. Brumfield; Rustic Hills Orthopaedic Association, P.C.; W.M. Campbell; Southern Colorado OB/GYN, P.C.; Joseph Carpenter; Joseph Carpenter, M.D., P.C.; John Chisholm; Denver Obstetrical and Gynecological Associates, P.C.; Harvey M. Cohen; Cohen and Conner Professional Corporation; Wayne Conner; Gayle P. Crawford; Drs. Ross and Crawford, P.C.; David L. Crosson; Pueblo Orthopedic Professional Corporation; Jacqueline M. DeMolin; Goodman OB/GYN Associates, P.C.; Larry M. Dewell; Beverly E. (Jessup) Donnelly; Fort Collins Women's Clinic, P.C.; Terry A. Downing; Terry A. Downing, M.D., P.C.; John H. Drabing; Thomas F. Driver; Paul S. Drohan; Paul S. Drohan, M.D., P.C.; Edward Duerksen; Edward Duerksen, M.D., P.C.; Samuel C. Duhon, Jr.; Samuel C. Duhon, Jr., M.D., P.C.; Edward L. Ehrichs; Reich & Ehrichs, P.C.; Frederick C. Feiler; Glen C. Ferguson; Glen C. Ferguson, D.O., P.C.; Glenn T. Foust, III; Denver–Evergreen OB/GYN Group, P.C.; Donald P. Gazibara; W.B. Goddard; Woodridge Women's Clinic, P.C.; Reid A. Goodman; Stanley N. Goodman; Ronald A. Green; Michael L. Hall; Linder and Hall OB/GYN Associates, P.C.; Gordon C. Ham; Gordon C. Ham, M.D., P.C.; Richard G. Hamill; David Harris; David Harris, M.D., P.C.; Lowell N. Harris; James F. Hartman; James F. Hartman, M.D., P.C.; Duval E. Harvey; Robert W. Hendee, Jr.; Pediatric Neurosurgery, P.C.; Raymond W. Henry; David F. Holz; Allied Foot and Ankle Clinics of Colorado, P.C.; Brett S. Hulet; Herbert L. Jacobs; Valerie A. Jacobs; David Kessel, M.D., P.C.; Arvada Pediatric Associates, P.C.; Ransy L. Jeffrey; Johnny E. Johnson, Jr.; Johnny E. Johnson, Jr., M.D., P.C.; Elisabeth Kandel; Family Medicine Associates, P.C.; Ralph L. Kelley; Corwin Orthopedic Group, P.C.; Kelvin F. Kesler; David Kessel; Thomas E. Kilfoyle; Edward Kirschman; Michelson, Losasso, and Kirschman, M.D., P.C.; Joshua J. Kopelman;

Eugene E. Lalli; Eugene E. Lalli, D.O. & Associates, P.C.; David Leistikow; Edward Lord; Leonard J. Losasso; Stephen L. Ludwig; Gary A. Ludwin; Eva Martin, Associates in Women's Health Care, P.C.; Thomas Tuttle McCarthy; Edward Larry McCleary; James W. Meeuwsen; M.H. Melmed; M.H. Melmed, M.D., P.C.; T. Robert Mestas; Gary A. Meyer; Abraham K. Michelson; David J. Muller; Martin E. Nowick; Martin E. Nowick, M.D., P.C.; E.P. O'Loughlin; Robert P. Paunovich; Mark W. Pfenninger; Mark W. Pfenninger, M.D., P.C.; Peter Press; Anesthesia Associates, P.C.; Alan M. Rapaport; Marshall P. Reich; Bruce C. Richards; Ira Rifkin; Ira Rifkin, M.D., P.C.; Michael H. Ross; Nancy A. Rudd–McCoy; Keith Sadler; Keith Sadler, M.D., P.C.; Ron Schneebaum; Joseph M. Sherman; Lloyd V. Shields; Joseph Shroyer; Murray M. Snyder; Contemporary OB/GYN, P.C.; Stanley H. Solomon; Lawrence Spivack; Colorado Eye Specialists, P.C.; Stephen L. Stoll; Phillip Tannenbaum; Phillip Tannenbaum, M.D., P.C.; Richard C. Taylor; Arapahoe Bone and Joint Surgeons, P.C.; Dwayne Thomason; Yona Victor; Joan Weiss; Robert Weiss; Robert Weiss, D.O., P.C.; Max L. Weissman; Russell J. Weister; Harry Wherry; Patrick Wherry; Kevin Whitaker; Derek Williams; Murray S. Willis; Murray S. Willis, M.D., P.C.; Mark R. Wolf; S. Steve Yasazawa; S. Steve Yasazawa, M.D., P.C.; and John R. Young, Plaintiffs–Appellees and Cross–Appellants,

v.

PHICO INSURANCE COMPANY, a Pennsylvania corporation, Defendant–Appellant and Cross–Appellee.

No. 90CA0062.

Colorado Court of Appeals, Div. II.

June 4, 1992.

Rehearing Denied July 16, 1992.

Certiorari Granted Dec. 14, 1992.

McDermott, Hansen, Anderson & Reilly, Gerald P. McDermott, Leland P. Anderson, Denver, for plaintiffs-appellees and cross-appellants.

Wood, Ris & Hames, P.C., Mary E. Kanan, Kathleen O. Nistico, Jane L. Schmutzler, Mary E. Gibbons, Denver, for defendant-appellant and cross-appellee.

Opinion by Judge HUME.

Defendant, Phico Insurance Company (PHICO), appeals the judgment entered against it and in favor of 105 doctors and/or their professional corporations joined as party plaintiffs on claims to recover damages for breach of contract, fraud and negligent misrepresentation, and breach of duty of good faith. Plaintiffs cross-appeal the trial court's measure and award of damages. We reverse and remand with directions.

This case arises out of medical malpractice insurance which PHICO provided to the doctors. Originally, the bulk of PHICO's business involved the insuring of hospitals. However, it decided to expand its business into insuring independent physicians. In the spring of 1981, PHICO began marketing policies in Colorado through independent insurance agents and by sending direct mailings to insurance agents and individual doctors.

These solicitations focused on "claims-made" insurance rather than "occurrence" coverage which previously had been the primary type of medical malpractice insurance in Colorado. The following description of terms used in this opinion will be helpful to clarify our disposition of the issued presented.

■■■ As pertinent here, occurrence coverage is sold on a yearly basis and covers all claims arising out of events occurring during the policy period regardless of when the claims are reported. In comparison, claims-made insurance is also sold on an annual basis, but it covers claims that are reported during the policy year which arise out of acts or omissions that occurred during the present or any preceding period of claims-made coverage provided to the insured by the same insurer.

Since a small percentage of claims that arise are reported during the first year, the premium charged for the first year of claims-made coverage is relatively low. The second claims-made year covers all claims reported during the second year that arise from both the first and second accident years. Thus, the second year premium is higher than the first year premium. The third claims-made year covers claims-made in the first, second, and third years and is correspondingly higher that the first and second year rates. The fourth year rate is also known as the "mature rate," and that rate levels out because most claims arising out of a particular year are reported within the first four years. The claims-made policies offered by PHICO were attractive because the doctor realized significant premium savings, especially in the early years.

■■■ If an insured's claims-made coverage is terminated or nonrenewed, the insured may obtain coverage for subsequently asserted claims based upon occurrences during the claims-made coverage period by purchasing a "tail" policy. The tail policy provides coverage for all future claims pertaining to acts or omissions that occurred during the period when the insured had a claims-made policy with the carrier issuing the tail policy. Essentially, a tail policy converts all previous claims-made policies into occurrence policies as to claims reported after the claims-made coverage period.

As an alternative to purchasing tail coverage from the same carrier who provided claims-made coverage, an insured may purchase a "prior acts" policy to obtain similar coverage from a different carrier.

When PHICO first entered Colorado, it was in a strong financial position and was able to expand. Thus, while initially it wrote only claims-made policies, it also began offering occurrence coverage in 1983. However, from 1983 to 1986, the company's independent physician loss ratios for Colorado were very high. For example, the loss ratio for 1984 was 155.6. This meant that for every premium dollar taken in, one

dollar and fifty-five cents was paid out or set aside for claims.

As a result of such loss rates, PHICO management implemented a number of changes. In 1984, it discontinued the occurrence and prior acts coverage for OB-GYNs, implemented rate increases for claims-made and tail factors, and stopped writing new policies for individual, independent physicians.

Instead, it would write policies only for physicians employed by its institutional clients or physician groups of five or more physicians. Despite these radical changes and indications that PHICO's continued presence in Colorado was questionable, the aggressive campaign for new business was kept intact. Ultimately, however, the board of directors voted in June 1986 not to renew claims-made policies for independent physicians and to withdraw completely from Colorado.

As a result of its withdrawal, the doctors commenced this action, alleging that PHICO's nonrenewal of the doctors' policies constituted fraud, negligent misrepresentation, and bad faith by virtue of the company's early marketing efforts describing PHICO as a strong and stable company. Additionally, the doctors alleged breach of contract regarding tail coverage rates, retirement provisions, and dividends provisions.

All of the plaintiffs requested compensatory and punitive damages and some claimed damages for emotional distress. Several also alleged interference with contracts and prospective business relations; however, those issues are not presented as part of this appeal. The trial court awarded compensatory damages to most of the plaintiffs and emotional distress damages to every plaintiff who made such a claim. Furthermore, punitive damages were awarded to 29 of the 105 plaintiff doctors.

## I.

Defendant first contends that the trial court erred as a matter of law in holding that it had breached its contracts with the doctors. We agree.

Plaintiffs claim that they each entered into a contract with PHICO and that PHICO breached this contract when it unilaterally changed the terms. Specifically, the doctors claim that PHICO breached the express and implied terms in two respects: by changing the tail percentage factors and the method by which tail coverage premiums were calculated. Implicit in the doctors' argument is that each original insurance policy together with each of its subsequent yearly renewals constituted *one* contract.

Defendant, on the other hand, argues that each annual renewal created a separate and distinct contract. Thus, when the doctors renewed their policies, they necessarily agreed to the changed terms. We agree with defendant.

■ An insurance policy is a contract and the standard rules of contract construction apply. *Republic Insurance Co. v. Jernigan*, 753 P.2d 229 (Colo.1988). The determination of whether a contract is ambiguous is a question of law, and we are not bound by the trial court's findings in that regard. *Buckley Bros. Motors, Inc. v. Gran Prix Imports, Inc.*, 633 P.2d 1081 (Colo.1981).

■ In ascertaining whether provisions of a written agreement are ambiguous, the instrument's language must be examined in accord with the plain and generally accepted meaning of the words used and reference must be made to all provisions of the contract. *Lister v. American United Life Insurance Co.*, 797 P.2d 832 (Colo.App.1990). In the absence of an ambiguity, a written contract cannot be varied by extrinsic evidence. *Pepcol Manufacturing Co. v. Denver Union Corp.*, 687 P.2d 1310 (Colo.1984).

■ Here, the dispute concerned the duration of each policy. The trial court found that the original policy declarations stated that each policy was for one year while the endorsements indicated that a four-year policy was contemplated. Because an insurance policy and an endorsement are considered a single instrument, *Martinez v. Hawkeye–Security Insurance*

*Co.,* 195 Colo. 184, 576 P.2d 1017 (1978), the trial court determined that this inconsistency created an ambiguity and that, therefore, extrinsic evidence could be considered. Ultimately, it found that a four-year claims-made policy was intended.

However, upon reviewing the relevant documents, we conclude that each policy, considered as a whole, was unambiguous and covered only a one-year period. Specifically, the policy stated that: "The policy period is the policy period shown on the Declarations." In turn, the declarations clearly indicated that the policy was for one year. Furthermore, the endorsement forms which set forth the tail premium percentages stated that "percentages increase *each policy year* for three years...." (emphasis added) In our view, this language, when construed with the declarations, indicates that a one-year contract period was intended.

◼ Because a renewal of an insurance policy is, in effect, a new contract of insurance, *Aronoff v. Carraher,* 146 Colo. 223, 361 P.2d 354 (1961), we conclude that defendant did not breach its contract with plaintiffs. *Cf. Allstate Insurance Co. v. Parfrey,* 830 P.2d 905 (Colo.1992) (applying statutory definition of "renewal policy" to automobile insurance). By entering into subsequent renewal contracts with PHICO, the doctors agreed to the changed terms of the new contracts.

## II.

Defendant next contends that the trial court erred in finding that the doctors proved claims for fraud and negligent misrepresentation. We agree.

◼ In order to prove fraud, plaintiffs must prove the existence of the following elements: (1) a false representation of material existing fact; (2) knowledge on the part of the one making the representation that it is false; (3) ignorance on the part of the one to whom the representation is made of the falsity; (4) that the representation was made with the intention that it be acted upon; and (5) damage caused by the representation. *Kinsey v. Preeson,* 746 P.2d 542 (Colo.1987).

◼ In order to serve as the basis of a fraud and deceit action, a representation need not always be made to the party seeking recovery. It is necessary only that the plaintiff be in the class of persons that defendant intended to be influenced by the misrepresentation. *See* Restatement (Second) of Torts § 531 comment e (1977); *see also Saine v. AIA, Inc.,* 582 F.Supp. 1299 (D.Colo.1984) (applying Colorado law).

◼ Similarly, the elements of fraudulent concealment are: (1) the concealment of a material existing fact that in equity and good conscience should be disclosed; (2) knowledge on the part of the party against whom the claim is asserted that such a fact is being concealed; (3) ignorance of that fact on the part of the one from whom the fact is concealed; (4) the intention that the concealment be acted upon; and (5) action on the concealment resulting in damages. *Ackmann v. Merchants Mortgage & Trust Corp.* 645 P.2d 7 (Colo.1982).

◼ The test of liability for failure to disclose facts material to a transaction includes the existence of some duty, legal or equitable, arising from the relation of the parties, such as that of trust or confidence, or superior knowledge or means of knowledge. *Cisneros v. Cisneros,* 163 Colo. 245, 430 P.2d 86 (1967). When such a relationship exists, full and fair disclosure of all material facts is required. W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Torts* § 107 (5th ed. 1984).

◼ While an insurance company stands in a position similar to that of a fiduciary, *Farmers Group, Inc. v. Trimble,* 691 P.2d 1138 (Colo.1984), it is not a fiduciary. *Rawlings v. Apodaca,* 151 Ariz. 149, 726 P.2d 565 (1986). In order to prevail on a claim of fraudulent concealment, a plaintiff must show that defendant actually knew of a material fact that was not disclosed. It is not enough that the defendant should have or might have known this fact. *Ackmann v. Merchants Mortgage & Trust Corp., supra.*

Finally, negligent misrepresentation includes the following elements:

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) ... [T]he liability stated in subsection (1) is limited to loss suffered (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it....

*First National Bank v. Collins,* 44 Colo. App. 228, 616 P.2d 154 (1980) (adopting Restatement (Second) of Torts § 552).

 The duty of care owed by the supplier of information is measured by the use to which the information will be put, weighed against the magnitude and probability of loss that might attend that use if the information proves to be incorrect. *Robinson v. Poudre Valley Federal Credit Union,* 654 P.2d 861 (Colo.App.1982).

 Although the Restatement rule does not require privity, a provider of information is liable only to those persons for whose guidance he knows the information to be supplied. Restatement (Second) of Torts § 552 comment i (1977); *see also Wolther v. Schaarschmidt,* 738 P.2d 25 (Colo.App.1986).

On review, we must view the evidence and reasonable inferences therefrom in a light most favorable to the prevailing parties. *Forsyth v. Associated Grocers of Colorado, Inc.,* 724 P.2d 1360 (Colo.App. 1986). Reversal of a trial court's findings of fact is warranted only when such findings are so clearly erroneous as to find no support in the record. *Peterson v. Ground Water Commission,* 195 Colo. 508, 579 P.2d 629 (1978).

Here, the trial court made extensive findings of fact regarding plaintiffs' claims for fraud, non-disclosure, and negligent misrepresentation. Specifically it found that the misrepresentations and non-disclosures fell into four categories: (1) misrepresentations about the longevity and stability of the company; (2) misrepresentations about the tail premium charges; (3) misrepresentations about the mature premium rate; and (4) misrepresentations about the rates being charged by PHICO.

 Based on our resolution of the breach of contract claim, we conclude that misrepresentations of the tail premium charges, the mature premium rate, and the rates being charged by PHICO must fail. Each of these charges was clearly indicated on the policy declarations and endorsements provided to the physicians.

Since a new contract was entered into each time a physician renewed his policy, each physician agreed to these changed terms upon renewal. While the tail premium charges, mature premium rate, and rates being charged by PHICO may have changed over time, there were no actionable misrepresentations or nondisclosures since each physician was supplied with the pertinent information at the time of each renewal. Thus, the only alleged misrepresentations remaining are those regarding the longevity and stability of PHICO.

 The trial court found that, despite the fact that the physician medical malpractice market had worsened, PHICO continued its aggressive marketing campaign. Specifically, the court found that PHICO was "assuring doctors of [the company's] longevity right up until the day they [sic] left the state." Additionally, the court concluded that the statements were more than opinions; they were assertions of fact upon which the doctors had relied in deciding whether to buy or to renew PHICO insurance.

In our view, however, these statements are more properly characterized as opinions relating to future events, and as such, they are not actionable.

 A mere expression of an opinion in the nature of a prophecy as to the

happening or non-happening of a future event is not actionable. *Leece v. Griffin,* 150 Colo. 132, 371 P.2d 264 (1962); *see also State Bank of Wiley v. States,* 723 P.2d 159 (Colo.App.1986) (failure to fulfill promise to do something in the future not actionable under a fraud theory). There is, however, an exception to this rule. When a promise concerning a future event is coupled with a present intention not to fulfill the promise then such misrepresentations are actionable as fraud. *Stalos v. Booras,* 34 Colo.App. 252, 528 P.2d 254 (1974).

Here, the alleged misrepresentations related to PHICO's intention to provide medical malpractice insurance coverage in Colorado well into the future. In 1984, two years after its entry into the Colorado market, PHICO ceased writing new policies for independent physicians. Nevertheless, it continued providing coverage for its existing insureds, and it assured its clients of its commitment to Colorado. It was not until two years later, in the summer of 1986, that PHICO definitively decided to withdraw from Colorado. Even then, PHICO continued coverage for those physicians with policies then in effect, and in some instances, it also renewed policies for doctors whose policies came up for renewal around the time the withdrawal was announced. Also, it offered to make tail coverage available to all of its claims-made policy holders who desired to purchase such coverage. Under such circumstances, we cannot conclude that PHICO had a present intention *not* to fulfill its promises regarding future events that were material to the terms of its contracts with the doctors.

■ Even if we were to assume, *arguendo,* that statements regarding PHICO's longevity and stability were actionable misrepresentations, plaintiff's argument must nevertheless fail. If there is no evidence of damage, a claim of fraud based on material misrepresentations must fall. *Ice v. Benedict Nuclear Pharmaceuticals, Inc.,* 797 P.2d 757 (Colo.App.1990).

Here, we perceive no damage to the physicians. There is no evidence that the physicians did not get that for which they had

bargained. PHICO continued its coverage of each doctor through his policy period. And, while policies may not have been renewed once PHICO decided to withdraw from Colorado, as discussed *infra,* an insurance company has no obligation to renew a policy. There is no guarantee that *any* company will remain in business forever. PHICO is no exception. Thus, insofar as any promises that may have been made as to the defendant's provision of coverage were not fulfilled, we do not perceive how plaintiffs were damaged thereby.

### III.

Defendant's third contention is that the trial court erred in finding that PHICO's conduct constituted breach of its duty of good faith. We agree.

Our supreme court first recognized the tort of bad faith breach of an insurance contract in *Farmers Group, Inc. v. Trimble, supra.* There, the court imposed a duty of good faith and fair dealing in a third party context. It reasoned that such a duty:

> [I]s grounded upon the special nature of the insurance contract and the relationship which exists between the insurer and the insured. The motivation of the insured when entering into an insurance contract differs from that of parties entering into an ordinary commercial contract. By obtaining insurance, an insured seeks to obtain some measure of financial security and protection against calamity, rather than to secure commercial advantage.

Thus, there exists a "quasi-fiduciary" relationship between the insurer and the insured. *Farmers Group, Inc. v. Trimble, supra; see also Rawlings v. Apodaca, supra* (insurer has some duties of fiduciary but is not a fiduciary).

■ A first-party bad faith claim was also recognized in *Travelers Insurance Co. v. Savio,* 706 P.2d 1258 (Colo.1985). In a first-party context, an insurer acts in bad faith if: (1) its conduct is unreasonable; and (2) the insurer knows that the conduct

is unreasonable or recklessly disregards the fact that the conduct is unreasonable.

Here, the acts which the trial court found constituted bad faith included concealment of PHICO's plan not to renew the doctors' policies, its misrepresentations about the terms of tail coverage, and the availability of dividends and tail coverage upon retirement. While the trial court characterized these acts as occurring in the overall course of conduct, we understand plaintiffs' argument to be that, by these acts, PHICO enticed plaintiffs to enter new policies or to renew existing policies with PHICO. Thus, we analyze the duty of good faith in the negotiations and renewal context.

Plaintiffs argue that the duty of good faith should be extended to include initial sales and renewal negotiations. In support of their argument, plaintiffs cite cases in which the duty of good faith has been applied outside the claims context. However, the authority cited by plaintiffs dealt primarily with the *cancellation* of insurance contracts, rather than non-renewal, and therefore, it is inapposite.

■■■ There is a distinct difference between cancellation and non-renewal. It is the insurance contract that creates the special relationship giving rise to the duty of good faith. Implied by the law as a covenant of each insurance contract is the duty of good faith. *Surdyka v. DeWitt,* 784 P.2d 819 (Colo.App.1989). Thus, when an insurer cancels a policy it is terminating an *existing* contract and its actions must conform to fiduciary standards of good faith. However, when an insurer decides not to renew a policy, it has already fully performed its contract and there no longer exists that special relationship giving rise to a duty of good faith. *See Gahres v. Phico Insurance Co.,* 672 F.Supp. 249 (E.D.Va.1987).

Other jurisdictions which have addressed this issue have held that, as a matter of law, insurance companies have no obligation to renew a policy. *See Gahres v. Phico, supra; Travelers Insurance Co. v. Lesher,* 187 Cal.App.3d 169, 231 Cal.Rptr. 791 (1986) (unless policy provides other-

wise, no duty to renew); *Coira v. Florida Medical Ass'n, Inc.,* 429 So.2d 23 (Fla.Dist. Ct.App.1983); *Egnatz v. Medical Protective Co.,* 581 N.E.2d 438 (Ind.Ct.App.1991); *Gautreau v. Southern Farm Bureau Casualty Insurance Co.,* 429 So.2d 866 (La. 1983) (no obligation to renew where policy contains provision allowing insurer to elect not to renew); *Armstrong v. Safeco Insurance Co.,* 111 Wash.2d 784, 765 P.2d 276 (1988) (absent statutory enactment, no duty on insurer to renew); *see also* 18 G. Couch, *Cyclopedia of Insurance Law* § 68.12 (M. Rhodes rev. ed. 1983) (if there is no clause in the policy expressly granting a privilege or imposing a duty of renewal, neither party has any right to require a renewal).

■■■ Here, there was no clause in the insurance policies covering renewal. Furthermore, the only statutory limitation regarding non-renewal is contained in § 10–4–109, C.R.S. (1987 Repl.Vol. 4A) which requires that the insurer give at least ninety days' advance notice of its intention not to renew. There is no dispute that defendant complied with the notice requirement.

Thus, because we conclude defendant had no duty to renew plaintiffs' policies, we further conclude that a bad faith cause of action cannot be based on defendant's non-renewal. *See Travelers Insurance v. Lesher, supra; Coira v. Florida Medical Association, Inc., supra; Armstrong v. Safeco Insurance Co., supra* (general duty of good faith does not mandate renewal).

■■■ We further hold that there is no heightened fiduciary duty of good faith in the negotiation context. Because it is the insurance contract that creates the special relationship giving rise to the duty of good faith, in the absence of a contractual relationship the implied covenant of good faith is likewise absent.

## IV.

Defendant next contends that the trial court erred in awarding punitive damages to 29 of the 105 plaintiffs. We agree.

■■■ There can be no award of exemplary damages in the absence of a successful

underlying claim for actual damages. *Concord Realty Co. v. Continental Funding Corp.*, 776 P.2d 1114 (Colo.1989); *see also* § 13–21–102, C.R.S. (1987 Repl.Vol. 6A).

Thus, because we have reversed the trial court's award of actual damages, its award of punitive damages cannot stand.

We have considered defendant's other contentions of error and find them to be without merit.

### V.

Plaintiffs cross-appeal the trial court's measure of and award of damages. However, based on our disposition of the issues on appeal, we need not address them here.

The judgment is reversed, and the cause is remanded for entry of judgment consistent with the views herein expressed.

SMITH and NEY, JJ., concur.