DECISION
This matter is before the court on defendant Law Engineer's ("LE") motion for summary judgment and motion to strike affidavits pursuant to R.C.P. 56.
Summary Judgment Standard
Summary judgment is a drastic remedy that should be cautiously applied. McPhillips v. Zayre Corp., 582 A.2d 747, 749 (R.I. 1990); Rustigian v. Celona, 478 A.2d 187, 189 (R.I. 1984). Summary judgment should be issued when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Alfano v. Landers,585 A.2d 651, 652 (R.I. 1991). In passing on a motion for summary judgment, the trial justice must review the pleadings and affidavits in a light most favorable to the party opposing the motion. McPhillips, 582 A.2d at 749; O'Hara v. John HancockMutual Life Insurance Co., 574 A.2d 135 (R.I. 1990). Nevertheless, the party opposing summary judgment may not rest upon mere allegations or denials in its pleading and has an affirmative duty to set forth specific facts showing a genuine issue of fact to be resolved at trial. Quimette v. Moran,541 A.2d 855, 856 (R.I. 1988). Failure to set forth such facts will result in summary judgment entered against the party opposing the motion. Ardente v. Horan, 117 R.I. 254, 257-58, 366 A.2d 162, 164 (1976). In reviewing the file, the trial justice searches for genuine issues of material fact but cannot determine them.Commercial Union Co. v. Graham, 495 A.2d 243, 245 (R.I. 1985);Saltzman v. Atlantic Realty Co., 434 A.2d 1343, 1345 (R.I. 1981).
Facts/Travel
An initially brief recitation of the facts is as follows. LE was hired in January of 1990 by Narragansett Capital, Inc. ("NCI") to perform a due diligence investigation of Dryvit, which NCI's acquisition company, Narragansett/DSI Acquisition Co., Inc. ("the Acquisition Company"), was considering buying. Dryvit manufactures exterior insulation finishes which are applied to the outside of homes, buildings, and other structures. Prior to 1990, Dryvit had experienced rust problems with some of the finishes. Part of LE's due diligence investigation was to evaluate the rust problem. In its confidentiality letter, NCI states that:
 You [LE] agree that the confidential material will be used solely for the purpose of permitting you to conduct a due diligence analysis of Dryvit for Narrgansett and that such information will be kept confidential by you.
The proposal by LE reiterates this and states:
 We understand that the details or purpose of our work should not be discussed with anyone during our site visits or meetings unless you have notified us otherwise.
The engineers at LE who evaluated the problems were Timothy Ozell and Robert Jenkins. Ozell and Jenkins spoke with various individuals at Dryvit, including Vincent Tamburrini, senior vice president of corporate development, Francis Quinn, a chemist in charge of research and development, and Philip Peterson, a chemical engineer in charge of the rust problem. Tamburrini was also a prospective buyer of Dryvit and after the acquisition became an officer of NCI. The three Dryvit employees involved in the acquisition were Tamburrini, Paul Hill (president of Dryvit), and Dennis Dallman.
LE issued its report on February 19, 1990, and delivered a copy of the report to various individuals at NCI and to Tamburrini at Dryvit. The report, consisting of over fifty pages, states on its title page: "This evaluation was prepared for the express intent of evaluating the outstanding engineering liabilities for the proposed purchase of DSI by Narragansett Capital and their designated parties." Page one of the report states: "Law Engineering, Inc. was retained by Narragansett Capital, Inc. to evaluate the three types of extraordinary problems. This evaluation was requested as part of the due diligence process of a purchase of Dryvit Systems, Inc. coordinated by Narragansett Capital."
NCI acquired Dryvit on March 1, 1990. Thereafter, Dryvit again experienced rust problems and in 1993 filed suit against numerous defendants, including LE. Count XXII of Dryvit's amended complaint alleges:
 18. In 1990, Law Engineering analyzed Feldspar and Morie sand which Dryvit had been purchasing. Law Engineering knew that Dryvit would be relying on its conclusions. Law Engineering released its report in February 1990. In its report Law Engineering concluded that the cause of the rust stains were both magnetic materials (such as magnetite and hematite) and a non-magnetic material known as iron pyrite ("pyrite"). Law Engineering stated that the Feldspar sand did not appear to contain pyrite. Law Engineering concluded that use of the Eriez magnet, combined with the Feldspar sand, would substantially eliminate Dryvit's rust stain problem: "[B]ecause of discontinued use of Jessie Morrie sand in September 1988, and the use of Feldspar F-82A sand which appears to be very clean sand, new complaints should be minimal for 1990."
 82. Law Engineering owed a duty to Dryvit to use reasonable care in providing accurate information in its analysis of the characteristics of the Feldspar sand and the effectiveness of the Eriez magnets on the Feldspar sand and the effectiveness of the Eriez magnets on the Feldspar sand used by Dryvit. Law Engineering breached that duty, thereby inflicting damage on Dryvit.
LE's Motion to Strike Affidavits
LE moves to strike the affidavits of Tamburrini and Quinn primarily because their affidavits are inconsistent with their deposition testimony. LE also argues the statements lack personal knowledge, and contain hearsay, conjecture and improper lay opinions. LE urges this Court to find that the affidavits were submitted in bad faith to delay the entry of summary judgment.
Under R.C.P. 56(g), a trial justice may impose sanctions against a party who files affidavits "in bad faith or solely for the purpose of delay." No Rhode Island case, however, expressly concerns striking an affidavit on the grounds asserted by LE. Federal authority is split regarding striking an affidavit when it is inconsistent with deposition testimony. One line of cases holds that "parties cannot thwart the purpose of Rule 56 by creating issues of fact through affidavits that contradict their own depositions." Darnell v. Target Stores, 16 F.3d 174, 177 (7th Cir. 1994). Under this line of cases courts reason that a "party should not be allowed to create issues of credibility by contradicting his own earlier testimony." Id. at 176. Seealso, Slowiak v. Land O'Lakes, 987 F.2d 1293, 1297 (7th Cir. 1993); Kennedy v. Allied Mutual Ins. Co., 952 F.2d 262, 266-67 (9th Cir. 1991).
Even under this first line of cases, however, some circuits are cautious about striking or disregarding affidavits. For instance, in Kennedy the ninth circuit follows the seventh and tenth circuits in not automatically disposing of every case in which an affidavit contradicts deposition testimony. Rather, these circuits hold that the court must find that the affidavit is a sham because it "flatly contradicts earlier testimony in an attempt to `create' an issue of fact." 952 F.2d at 267. Seealso Lowery v. Airco, Inc., 725 F. Supp. 82, 86 (D. Mass. 1989). Furthermore, these circuits allow an affidavit to contradict deposition testimony "if the affiant lacked access to material facts and the affidavit sets forth the newly discovered evidence.'" Kennedy, 952 F.2d at 266. See also, Olin v.Disneyland Int'l, 832 F. Supp. 1342, 1345-46 (D. Ariz. 1993) ("If the affidavit is not merely a flat contradiction of the deposition, but rather points out that genuine issues of fact remain, summary judgment may be inappropriate").
A second line of federal cases focuses on the jury's role in assessing credibility and holds that affidavits which contradict deposition testimony may be considered. See Kennett-MurrayCorp. v. Bone, 622 F.2d 887, 893 (5th Cir. 1980); PermaResearch and Development Co. v. Singer Co., 410 F.2d 572, 578 (2nd Cir. 1969) ("if a witness has made an affidavit and his deposition has also been taken, and the two in some way conflict, the court may not exclude the affidavit from consideration in the determination of the question of whether there is any genuine issue as to any material fact"). In Kennett-Murray Corp., the fifth circuit quotes Moore's Federal Practice: "An opposing party's affidavit should be considered although it differs from or varies his evidence as given by deposition or another affidavit and the two in conjunction may disclose an issue of credibility." 622 F.2d at 893. See also, Adams v. UnitedStates, 392 F. Supp. 1272, 1274 (E.D. Wisc. 1975).
Even under the more stringent first line of cases, LE's motion to strike should not be granted because none of the statements in the affidavits "flatly contradict" earlier deposition testimony.
With respect to Tamburini's affidavit, LE objects to paragraph 2 where he states the report was delivered to him on February 19, 1990. This statement does not contradict his deposition testimony that he could not recall the date of the report, especially since he did not have a copy of the report before him at the deposition, nor did he review any documents before the deposition.
LE additionally objects to Tamburrini's statement in paragraph 4 that he had "no connection of any kind" with the acquisition company as he was not an officer, director, employee or shareholder. This does not flatly contradict his deposition testimony that he was involved in meetings with the acquisition company for 12 months and became an officer of NCI after it acquired Dryvit.
LE objects to Tamburrini's statement in paragraph 5 that he made it clear to LE that Dryvit was interested in the report. This does not contradict his deposition testimony that Dryvit believed it had solved the rust problem.
LE objects to paragraph 8 in which Tamburrini refers to a telephone call he had with Ozell and Jenkins two days after the report was released. LE objects on the basis that the letter attached to the affidavit refers to a telephone conversation in which the mesh, not rust, problem was discussed. This doesn't contradict the attached letter, however, because the letter does not specify that mesh was the exclusive problem discussed. Furthermore, the affidavit explains that Tamburrini did not recall the telephone conversation at his deposition, but when he saw a copy of the letter, it refreshed his memory regarding the conversation.
LE objects to the statement in paragraph 8 that Dryvit relied on the report in continuing to use Feldspar sand after February of 1990 because in Tamburrini's deposition he said he did not personally participate in the decision to switch sand. However, Quinn reported to him and Tamburrini could thus make the affidavit statement.
LE also objects to Tamburrini's affidavit statement in paragraph 8 that although Dryvit thought it had controlled the rust problem, the report made it clear that the rust was caused by pyrite. This does not contradict his deposition testimony that before the report he didn't know of "pyrite."
With regard to Quinn's Affidavit, LE objects to paragraph 5 in which Quinn refers to numerous conversations with Ozell and Jenkins. LE claims paragraph 5 contradicts his deposition, in which he testified that he could recall only vague bits and pieces of the conversation. This objection should be overruled because Quinn's deposition testimony supports paragraph 5 of his affidavit. The affidavit states: "They asked me a great many questions about the history of this [rust] problem, what Dryvit had done to address it, and what we thought the cause was." His deposition contains the following:
 Q. Do you recall any subjects or topics that were discussed during the meeting?
 A. I believe it was primarily discussing the high standard issue and the rust issue.
 Q. When you say the high standard issue, you mean the mesh issue?
 A. Yes, the mesh.
 Q. Specifically with respect to the rust issue, can you recall any conversation, discussions?
 A. I believe we went through the whole history of the rust problem from our perspective, what we had done and the actions taken and the result of those actions.
 Q. As best you can recall, tell me what you told them with respect to the history of the rust problem?
 A. That the rust problem developed in Rhode Island in using Jessie Morie sand, and that with the installation of rare earth magnets and the switch to Feldspar sand, that the problem was addressed and solved.
Thus, the deposition testimony does not flatly contradict Quinn's affidavit statement.
LE further objects to paragraph 6 of Quinn's Affidavit regarding the statement that Quinn made it clear to LE that he was interested in its analysis and wanted to know the results. LE claims that Quinn does not mention this in his deposition. However, Quinn was not asked this question when he was deposed.
LE objects to paragraph 10 and paragraph 15 in which Quinn states that Dryvit continued using the Feldspar sand based on Ozell's oral statement that Dryvit was safe using it until the mining location changed. LE argues that Ozell's deposition says this was an inference from a telephone conversation and further, that this was not included in interrogatory responses. LE's objection is overruled because the affidavit does not flatly contradict the deposition testimony. Quinn states in his deposition:
 A: We were more concerned with the mine-changing locations than with the pyrite showing up in the same location. The inference we get in discussions with Tim Ozell was the pyrite. We are safe now where they are mining the sand, but just make sure they don't change the location of their mining because then you can run into a problem.
 Q: You're saying Tim Ozell told you that?
 A: Yes
 Q: This is a telephone conversation you had with Tim Ozell?
 A: Correct.
In a later portion his deposition testimony reads:
 My main concern and the concern that undoubtedly I got from Tim was that if Feldspar changes the location of where it's mining, we got to be careful. We've got clean sand now, okay, and if they change the location, we've got to be leery and we've got to check that. Also, if we get a new source, we've got to check that. It was never emphatically told to us that, "Gee, the sand you've got today may not be good tomorrow." It was never — That was never a warning we got from them. It was more you got to be careful if you change the sites of where they are mining the sand. If you change sources —
LE also very generally objects to the affidavits on the basis that Tamburrini and Quinn lack personal knowledge. See Berickv. Curran, 55 R.I. 193, 198, 179 A. 708 (1935) (requiring that summary judgment affidavits be based on personal knowledge);United States v. Soares, 456 F.2d 431 (10th Cir. 1972). However, with the exception of the objection to Tamburrini's involvement in the rust problem, which is addressed above, LE has not specified which statements lack personal knowledge. This objection also must be overruled. See Perma Research andDevelopment Co. v. Singer Co., 410 F.2d at 579 (motion to strike "`should state specifically the portions of the affidavit to which objection is being made, and the grounds therefor'").
LE further objects to Quinn's affidavit on the basis that it contains hearsay and improper lay opinions. Although hearsay evidence cannot be considered on a motion for summary judgment,Garside v. Osco Drug Co. Inc., 895 F.2d 46, 50 (1st Cir. 1990), LE's claim that Quinn's affidavit contains hearsay is a broad generalization unsupported by specific instances. This objection is likewise overruled. See Perma Research and Development Co.v. Singer Co., 410 F.2d at 579.
LE's also objects to Quinn's "expert" testimony in paragraph 14 regarding LE's testing methods. The affidavit paragraph states in part:
 Law most certainly was negligent in reporting that Feldspar sand was pyrite-free, because Law's method of testing the samples was woefully defective. After the report was issued, Law told me that it had tested for pyrite by visually separating out, on a grain-by-grain basis, individual grains of sand which it considered "suspect." Relying on a human being to "eyeball" and separate out "suspect" grains of sand is not an effective way to screen for pyrite, and no report should ever have been based on this technique. Gravimetric or other chemical separation techniques must be used to identity pyrite in sand.
LE here raises 2 arguments: (1) at Quinn's deposition, his counsel stated he was not testifying as an expert witness, but as a fact witness; (2) Quinn stated in his deposition that he was not aware of the gravimetric separation techniques until a year after LE's report was issued. LE's objections are overruled because as counsel for Dryvit pointed out during oral argument at the summary judgment hearing, in this jurisdiction an expert witness cannot be deposed, and that was the basis for the objection. Moreover, at his deposition Quinn discussed gravimetric separation technique in great detail and even though he did not become aware of the technique until a year after the report was issued, he could still opine that LE should have employed gravimetric separation. As none of the affidavit statements of Tamburrini or Quinn flatly contradict earlier deposition testimony or contain statements inadmissible under the rules of evidence, LE's motions to strike the affidavits are overruled.
LE's Motion for Summary Judgment on Dryvit's NegligentMisrepresentation Claim
In order to prevail on summary judgment LE must show that there is no issue of material fact and that as a matter of law Dryvit's claim of negligent misrepresentation fails. According to the Restatement (Second) of Torts, § 552, which Rhode Island has adopted in Estate of Braswell v. People's Credit Union,602 A.2d 510, 515 (R.I. 1992), negligent misrepresentation occurs when:
 (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
 (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to the loss suffered
 (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
 (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.
 (3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.
Applying these elements of negligent misrepresentation, this Court finds that genuine issues of material fact exist which preclude summary judgment.
1. Negligent assertion of a false statement
The first element of negligent misrepresentation is the negligent assertion of a false statement. See Gross v. SussexInc., 630 A.2d 1156, 1162 (Md. 1993) (listing elements of negligent misrepresentation).[1] LE argues that it was not negligent and that it did not make a false statement. In its briefing, LE focuses on the sole misrepresentation specified in Dryvit's amended complaint: the conclusion in the Report that "[B]ecause of discontinued use of Jessie Morrie sand in September 1988, and the use of Feldspar F-82A sand which appears to be very clean sand, new complaints should be minimal for 1990." Dryvit, on the other hand, contends that LE made many misrepresentations in addition to this one statement. Tamburrini's affidavit lists the following false statements made in the report:
 "It is our opinion that there should be a minimal number of new rust problem sites reported in 1990" (p. 2)
 "Examination of the sands presently being used at the Warwick plant did not find iron pyrite particles" (p. 2)
 "It is our opinion that the present manufacturing procedures do not produce product that will have a rusting problem." (p. 2)
 ". . . it appears that the sands from Florida do not contain [pyrite]." (p. 13)
 "Therefore most of the sites where rusting is a problem should have been reported by this time." (p. 14)
 "However, because of the discontinued use of Jessie Morie sand in September 1988, and the use of Feldspar F-82A sand which appears to be a very clean sand, new complaints should be minimal for 1990." (p. 14)
 "From our examination, it does not appear that the sand presently being used contains iron pyrite minerals . . ." (p. 16)
In addition to this list in Tamburrini's affidavit, Quinn objected to specific paragraphs of the report during his deposition, and also made general statements regarding his objections to the report, including questionable testing performed on the sand by LE, the lack of a strong warning to continually test sand, and the lack of knowledge that Feldspar was prone to pyrite. Furthermore, during oral argument, counsel for Dryvit indicated that another false representation was LE's statement to Dryvit (Quinn) in March of 1990 that it was safe to use Feldspar sand until the mining location changed.
Regarding the alleged misrepresentation raised in Dryvit's amended complaint — that "new complaints should be minimal for 1990" because of the use of the Feldspar sand — LE argues this is a projection of future events and is thus not actionable. LE's reliance on Ballow v. Phico Ins. Co., 841 P.2d 344 (Colo. App. 1992), rev'd, 875 P.2d 1354 (Colo. 1993); City of Beaumontv. Excavators Constructors, Inc., 870 S.W.2d 123 (Tex. App. 1993); and Bower v. Atlis Systems, Inc., 582 N.Y.S.2d 542 (A.D. 1992), denied, 589 N.Y.S.2d 309 (1992) is misplaced. These cases are factually distinguishable because none of the misrepresentations made were based on expert analysis.
And while Dryvit argues that expert opinions are actionable, citing White v. Pepin, 561 A.2d 94, 97 (Vt. 1989), and Herrickv. State, 196 A.2d 101, 104 (Me. 1963), these cases hold that expert opinions are actionable where they are part of a scheme to defraud, which is not alleged by Dryvit. Nonetheless, a prediction may be actionable when "the speaker purports to have special knowledge of facts which would justify the expectations he is raising." Prosser, Torts, Ch. 18, § 109, p. 762. CitingClaus v. Farmers Stockgrowers State Bank, 63 P.2d 71 (Wyo. 1936). See also, Eastern States Petroleum Co., Inc. v.Universal Oil Products Co., 3 A.2d 768, 775-76 (Del. Ch.an. 1939) ("What are expressions of opinion and what are statements of fact are often difficult to determine; but the mere fact that a material statement is in the form of an opinion, or an estimate, is not necessarily conclusive" and when a representation is made by an expert, "that fact is often important in considering what can be fairly and reasonably understood as a mere opinion and what is a misstatement of fact").
Accordingly, this Court rejects LE's argument that the statement in the report is a prediction of future events that is not actionable. Even though the statement is a prediction, it may be actionable because it is based on special engineering knowledge.
Additionally, Dryvit contends LE made other false representations. The statements Dryvit relies on arguably contain both facts and opinions. And while generally a misrepresentation must be one of material fact, not of opinion, East ProvidenceLoan Co. v. Ernest, 103 R.I. 1259 [103 R.I. 259], 236 A.2d 639, 642 (1968), comment "e" to Restatement § 552 states that "When the information consists of an opinion upon facts supplied by the recipient or otherwise known to him, the recipient is entitled to expect a careful consideration of the facts and competence in arriving at an intelligent judgment." Thus, although generally opinions are not actionable, as is the case with predictions, opinions may be actionable when "special circumstances make it very reasonable or probable that the plaintiff should accept the defendant's opinion and act upon it." Prosser, ch. 18, § 109, p. 760. See also West v. Western Cas. and Sur. Co., 846 F.2d 387, 393-95 (7th Cir. 1988) ("A statement that, standing alone, appears to be a statement of opinion, nevertheless may be a statement of fact when considered in context"; "statements of opinion are treated as statements of fact when the speaker has held himself out as having special knowledge"); Pincetich v.Jeanfreau, 699 F. Supp. 1469, 1477 (D.Or. 1988) (statements of opinion may be actionable where there is a fiduciary relationship). Thus, the summary judgment evidence raises a material issue of fact concerning whether LE asserted a false statement.
LE's Negligence. In addition to arguing that it did not make a false representation, LE also argues that is was not negligent. LE argues that its conclusion that Feldspar did not contain pyrite was not negligent because Dryvit supplied the samples and because Dryvit cannot prove those samples actually contained pyrite. Apparently, the samples have subsequently been destroyed according to the terms of the contract between LE and NCI. The arguments LE raises do not negate its negligence; if anything, they are defensive arguments that presume a genuine issue of material fact.
LE's standard of care is that of reasonable care and competence of experts in the field. See Bay Garden ManorCondominium Association, Inc. v. James D. Marks Associates,Inc., 576 So.2d 744 (Fla. App. 1991); Wolther v.Schaarschmidt, 738 P.2d 25 (Colo. App. 1986); Howell v.Fisher, 272 S.E.2d 19 (N.C. App. 1980), pet. denied,
277 S.E.2d 69 (N.C. 1981). Quinn's affidavit raises a genuine issue of fact regarding LE's negligence in the testing methods used on the samples.
For these reasons, this Court is satisfied that the evidence raises a genuine issue of fact regarding the first element of negligent misrepresentation.
2. Duty owed by LE to Dryvit
The second element of negligent misrepresentation is that the maker owes a duty of care to the recipient. LE argues it owed Dryvit no duty because it did not intend to supply the information to Dryvit and did not know that NCI intended to supply it to Dryvit. LE relies on the following summary judgment evidence: the confidentiality document from NCI to LE, the proposal from LE to NCI, and the cover page of the Report. The relevant portions of these documents have been quoted above and will not be repeated here; however, these documents indicate that the understood purpose of the report was to conduct a due diligence evaluation of Dryvit for NCI's intended acquisition.
LE also relies on the affidavits of Ozell (LE's Materials Engineer who signed the Proposal) and Jenkins (LE's Corporate Materials Consultant). These affidavits indicate that Ozell and Jenkins knew and intended that NCI alone would use the results of the due diligence report and only for the purpose of deciding whether to purchase Dryvit. These affidavits also state that Ozell and Jenkins followed the terms of the confidentiality agreement and "disclosed the purpose of LE's services only to those Dryvit personnel designated by the Acquisition Company." Finally, the affidavits state that LE supplied a copy of the report to Tamburrini, in his "personal capacity as a purchaser of Dryvit and a party to the Dryvit acquisition transaction." LE also relies on the depositions of various Dryvit personnel who testified they did not see the report or know what LE was doing. In short, LE argues that it owed no duty to Dryvit because it intended the report to benefit NCI rather than Dryvit.
Dryvit concedes that LE did not owe Dryvit any duty under the contract. Dryvit argues that LE owed Dryvit a tort duty based on the following summary judgment evidence: both Tamburrini and Quinn made it clear to LE that they were interested in the analysis and conclusions; Quinn's affidavit states that he received a copy of the report shortly after it was issued and he discussed it with Tamburrini; Quinn's affidavit also states that when Dryvit hired LE in March of 1990 (after the report was issued), Ozell then stated that it was safe to continue using Feldspar sand. Tamburrini's affidavit states that LE delivered a copy of the report to him on February 19, 1990, and on this date he had no connection with NCI or with the acquisition company, but that he became an officer and director of the Acquisition Co. after LE sent the report.
Tamburrini also states that in his capacity as an officer of Dryvit, he learned that NCI had hired LE to evaluate the rust problem, that he expressed interest in the results of the report, and was not surprised to receive a copy of the report. Tamburrini's affidavit also states that other purchasers were not sent a copy of the report and that the cover of the report refers to him as "V. Tamburrini — Dryvit Systems, Inc." He also states that two days after the report he talked with Ozell and Jenkins "as it related to Dryvit, to Dryvit's operations and to Dryvit's sand-use decisions." Dryvit also relies on the cover letter attached to the report, which refers to Tamburrini as "Senior Vice President with Dryvit Systems, Inc."
These facts raise a genuine issue concerning LE's duty to Dryvit. Although the law in this area is not settled, whether a supplier of information owes a duty of care to the receiver can be analyzed three ways.[2] One line of cases "suggest that the controlling question is whether it was foreseeable to the negligent supplier of information that the injured party would rely on the information." Guardian Const. Co. v. Tetra TechRichardson, Inc., 583 A.2d 1378, 1382 (Del Super. 1990). Under this test, privity of contract is not required.
Dryvit urges the court to apply this forseeability test and relies on a 1968 Rhode Island federal district case, RuschFactors, Inc. v. Levin, 284 F. Supp. 85, 90-93 (D.R.I. 1968), which held an accountant liable for negligent misrepresentations "relied upon by actually foreseen and limited class of persons." Dryvit also relies on a 1986 Colorado decision, Wolther v.Schaarschmidt, 738 P.2d 25 (Colo. App. 1986), in which an engineer prepared a property appraisal of a private home for the lender who then approved the loan based on the report's evaluation of the home as structurally sound. The home owner sued when he discovered structural defects. The appellate court overturned the trial court's granting of summary judgment on the basis that even though the engineer filed an affidavit stating that he did not intend that any prospective buyer would act in reliance on his report, and even though the home owner did not see a copy of the report, the engineer talked to the home owner, who could rely on the lender's approval of his loan as confirmation that the report was favorable. 738 P.2d at 28. The decision states: "Under Restatement § 552 (2)(a), the provider of information is liable to those persons to whom he `knows' the recipient of the information intends to supply it." Id. Seealso, Rosenblum v. Adler, 461 A.2d 138, 153 (N.J. 1983) (plaintiffs who acquired the common stock of a company successfully sued the accounting firm which had audited the company's financial statements. The court held that the accounting firm knew or should have known that the plaintiffs were foreseeable users of the audit).
LE, on the other hand, urges this court to follow the second line of cases which "require that the faulty information be intended by its negligent supplier to be specifically relied upon by a particular party or a settled class of parties before economic damages are recoverable on a negligence theory."Guardian Const. Co., 583 A.2d at 1382. Privity of contract is not required under this test, either. This second line of cases requires that:
 if, in the course of its business, [the supplier of information] negligently obtained and communicated incorrect information specifically known and intended to be for the guidance of Plaintiffs, and if it is specifically known and intended that Plaintiffs would rely in calculating their project bids on that information, and if Plaintiffs rely thereon to their detriment, then [the supplier of information] should be liable for foreseeable economic losses sustained by Plaintiffs regardless of whether privity of contract exists.
Guardian Construction Co., 583 A.2d at 1386. In many cases, the first and second tests are combined, and courts discuss foreseeability along with knowledge and intent. See, e.g.,Robert Co. v. Rhodes-Haverty Partnership, 300 S.E.2d 503, 504 (Ga. 1983).
LE urges this Court to follow jurisdictions which apply the more stringent requirement of the second test as in Bates Associates, Inc. v. Romei, 426 S.E.2d 919, 922-93 (Ga. App. 1993); LE argues this test tracks comment "a" to the Restatement, which states: "one who relies upon information in connection with a commercial transaction may reasonably expect to hold the maker to a duty of care only in circumstances in which the maker wasmanifestly aware of the use to which the information was to be put and intended to supply it for that purpose" (emphasis added). In Bates Associates, Inc. the court explains the requirement of manifest awareness:
 the maker, as therein defined, who supplied the false information was manifestly aware of the use to which the information was to be put and intended that it be so used (it is not sufficient that the maker should have been aware of the use to which the information was to be put, rather the requirement is that of a manifest awareness. That which is manifest is that which is evident to the senses, obvious to the understanding, evident to the mind, not obscure or hidden, and is synonymous with that which is open, clear, visible, unmistakable, indubitable, indisputable, evident, and self-evident [citing Black's Law Dictionary].
426 S.E.2d at 922-23.
Without deciding which test our Supreme Court would apply, even under the more stringent test, which requires that the supplier of information knew and intended that the defendant would rely on the information, there is evidence before this Court which raises an issue whether LE supplied the report knowing and intending that it would be for the guidance of Dryvit. Specifically, there is evidence that Tamburrini and Quinn told LE they were interested in the report, and Tamburrini discussed the work with LE two days after it was released. Moreover, LE gave a copy of the report to Tamburrini and there is a question of fact as to whether LE gave a copy of the report to Tamburrini in his capacity as an NCI purchaser or in his capacity as a representative of Dryvit.
3. Justifiable reliance by Dryvit
The third element of negligent misrepresentation is justifiable reliance, which requires that the plaintiff show "he was induced to act because of his reliance upon the alleged false representation." East Providence Loan Co. v. Ernest, 236 A.2d at 642. Reliance need not be proved by direct evidence, but may be inferred by the circumstances. Id. Moreover, the fact that the plaintiff is an "expert" in the field of defendant's expertise does not preclude recovery. See Gross v. Sussex,
630 A.2d at 1166-67. Nor does the fact the plaintiff had the opportunity to learn the facts or to make an independent investigation. Id. at 1165-66.
LE argues that Dryvit either did not actually rely or did not reasonably rely on the report because LE did not tell Dryvit anything that Dryvit did not already know or had not already concluded for itself based on its independent investigation. LE relies on deposition testimony by Tamburrini and Quinn to this effect (i.e., Tamburrini stated that the report "confirmed what our findings were").
Dryvit's affidavits raise an issue of fact, however. Tamburrini and Quinn both state that the report did not confirm what they knew (that the cause of rust was magnetic iron, which could be removed by magnets), but informed them that one of the causes of rust was a non-magnetic compound (pyrite) which could not be removed by magnets. In continuing to use Feldspar sand, there is evidence that Dryvit relied on the report's conclusion that the magnets could remove the iron-based rust causes, and that pyrite was not in the Feldspar sand. Because the report was allegedly incorrect, Dryvit claims to have suffered economic losses. This evidence is sufficient to raise an issue on summary judgment. See L P Converters, Inc. v. Alling Cory,642 A.2d 264, 268-69 (Md. App. 1994) (book publisher justifiably relied on paper converter's paper sample and representation that it would meet government requirements; publisher was not required to ascertain for itself whether sample met government requirements).
LE also claims that Dryvit did not justifiably rely on the report because it did not heed the recommendation to test the sand for pyrite and because it continued to purchase Feldspar sand even after it knew the sand had pyrite. The report states:
 It is our opinion that the present manufacturing procedures do not produce product [that] will have a rusting problem. It is our recommendation that sand sources be checked by petrographic examination on a periodic basis and before a new source is used. Petrographic examinations will identify iron pyrite or other non-magnetic iron particles which could cause rusting.
LE relies on evidence indicating Dryvit did not perform these periodic examinations. LE also relies on the deposition of Peterson, Dryvit's chemical engineer, who stated that he knew the sand sources could become contaminated even if the mining location remained the same. Dryvit concedes it does not have a claim for negligent misrepresentation against LE after it continued to purchase Feldspar sand knowing it had pyrite.
Concerning the report's recommendation to periodically test for pyrite, the summary judgment evidence raises an issue of material fact that Ozell subsequently told Dryvit it was more important to quit using the sand when the supplier changed its mining location. Moreover, Quinn states in his deposition that Dryvit did attempt to periodically test the sand but LE's testing was too time-consuming and the recommendations regarding testing were vague. Quinn also stated that eventually Dryvit hired another consultant in 1991 who introduced Dryvit to the gravimetric separation technique, which was subsequently used.
Accordingly, there is a genuine issue of fact regarding Dryvit's reliance on LE's representations.
Conclusion
Because the summary judgment evidence raises a genuine issue of fact regarding Dryvit's negligent misrepresentation claim, LE's motion for summary judgment is denied.
Counsel shall submit the appropriate judgment for entry.
[1] Neither party addresses the fourth element that the receiver of information suffered damages proximately caused by the supplier's negligence; however, there is summary judgment evidence that raises this issue of fact as the discussion below regarding reliance indicates. Moreover, LE argues that Dryvit's claim must fail because the transaction between LE and NCI was not substantially similar to Dryvit's transaction. However, the requirement of substantial similarity is not addressed in this decision because it is an alternative element of § 552(2)(b): "through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction."
[2] The third line of cases requires privity of contract.Guardian Const. Co., 583 A.2d at 1382. Because many jurisdictions reject this test, Rosenblum v. Adler,461 A.2d 138, 145 (N.J. 1983), and because neither Dryvit nor LE urge the Court to apply it, this Court will not consider requiring privity for negligent misrepresentation.